BRYAN SELLS
LAUGHLIN MCDONALD
American Civil Liberties Union Foundation, Inc.
2600 Marquis One Tower
245 Peachtree Center Avenue, NE
Atlanta, GA 30303
(404) 523-2721
(404) 653-0331 (fax)
bsells@aclu.org
lmcdonald@aclu.org

ELIZABETH L. GRIFFING
American Civil Liberties Union
     of Montana Foundation, Inc.
241 E. Alder, Ste. B
P.O. Box 9138
Missoula, MT 59802
(406) 830-3009
betsyg@aclumontana.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| STEVE KELLY and CLARICE DREYER,<br><br>    Plaintiffs,<br><br>    v.<br><br>BRAD JOHNSON, in his official capacity as Secretary of State of the State of Montana,<br><br>    Defendant. | Civil Action No. CV-08-25-BU-SEH<br><br>**EXPEDITED CONSIDERATION REQUESTED** |

**PLAINTIFF'S BRIEF IN SUPPORT OF THEIR
MOTION FOR A PRELIMINARY INJUNCTION**

Montana's ballot-access scheme for independent and minor-party candidates is the most burdensome in the nation. The scheme's early deadline, high signature requirement, and mandatory filing fee make it all but impossible for such candidates to get on the ballot. The plaintiffs claim in this lawsuit that these burdens violate their rights under the First and Fourteenth Amendments to the United States Constitution, and they argue that the outcome of this case is controlled by *Anderson v. Celebrezze,* 460 U.S. 780 (1983). They have asked this Court to issue a preliminary injunction prohibiting the defendant from enforcing the ballot-access scheme, requiring the defendant to place the name of Plaintiff Steve Kelly on the ballot, and for other relief as the Court deems equitable and just. The plaintiffs now respectfully submit this brief in support of their motion for a preliminary injunction.

## I. BACKGROUND

### A. The Statutory Scheme

Montana law creates a two-tiered ballot-access scheme for candidates seeking to run for non-presidential offices: one for qualified parties and one for independent and minor-party candidates. A qualified party is any party that had a candidate for statewide office who met a certain vote threshold in either of the last two general elections or that submitted a party-qualifying petition meeting the requirements of Mont. Code Ann. § 13-10-601.

Qualified parties nominate their candidates by primary election, and their nominees appear automatically on the general-election ballot. Mont. Code Ann. § 13-10-201. In order to appear on the primary- election ballot, candidates seeking the nomination of a qualified party need only to submit a declaration for nomination and pay the filing fee prescribed by Mont. Code Ann. § 13-10-202. The declaration-for-nomination form does not require the candidate to collect or submit any petition signatures. Mont. Code Ann. § 13-10-201. The form is due 75 days before the primary election at which the candidate seeks to appear on the ballot. Mont. Code Ann. § 13-10-201.

Independent and minor-party candidates, on the other hand, appear on the general-election ballot only if the candidate or party submits a nominating petition meeting the requirements of Mont. Code Ann. §§ 13-10-501 through -503 and pays the filing fee prescribed by Mont. Code Ann. § 13-10-202. Nominating petitions must contain the signatures of at least 5% of the total votes cast for the successful candidate for the same office in the last general election. Mont. Code Ann. § 13-10-502. Nominating petitions for independent and minor-party candidates seeking to appear on the general-election ballot are due 75 days before the date of the primary election for qualified parties. Mont. Code Ann. § 13-10-503.

The filing fee and deadline are new. The Montana Legislature amended the ballot-access scheme for independent and minor-party candidates at the

Legislature's regular session in 2007. S. 270, 2007 Leg., Reg. Sess. (Mont. 2007). Prior to the 2007 amendment, the nominating petition deadline was the first Monday in June and no filing fee was required. S. 270, 2007 Leg., Reg. Sess. (Mont. 2007). This is the first year in which the new ballot-access scheme has applied to a statewide general election.

This year, the deadline for nominating petitions was March 20, 2008 - exactly 229 days before the general election. For United States Senate, the number of signatures required was 9,993, and the filing fee was $1693.00. Together, these requirements make Montana's scheme for independent and minor-party candidates the most burdensome in the nation.

### B.  The Plaintiffs

Plaintiff Steve Kelly is a United States citizen and a resident of the State of Montana. Verified Complaint at 2. He is a resident and registered voter in Gallatin County, Montana. Verified Complaint at 2. He ran for Congress as an independent candidate in 1994 and desires to run as an independent or minor-party candidate for United States Senate this year. Verified Complaint at 2. In order to do so, he must collect the signatures of 9,993 electors and must pay a $1,693.00 filing fee. Verified Complaint at 4.

Plaintiff Clarice Dreyer is a United States citizen and a resident of the State of Montana. Verified Complaint at 2. She is a resident and registered voter in Gallatin County, Montana. Verified Complaint at 3. She would like to

have the opportunity to vote for Steve Kelly in the November general election.
Verified Complaint at 3.

## II. ARGUMENT

To obtain a preliminary injunction, a plaintiff must demonstrate: "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)." *Johnson v. Cal. State Bd. of Accounting*, 72 F.3d 1427, 1430 (9th Cir. 1995). Alternatively, injunctive relief can be granted if a party demonstrates: "either 1) a combination of probable success on the merits and the possibility of irreparable injury, or 2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor." *F.D.I.C. v. Garner*, 125 F.3d 1272, 1277 (9th Cir. 1997). *Accord, Connecticut General Life Ins. Co. v. New Images*, 321 F.3d 878, 881 (9th Cir. 2003); *SW Voter Reg. Educ. Project v. Shelley*, 344 F.3d 914, 917-18 (9th Cir. 2003). As the court explained in *Clear Channel Outdoor Inc. v. Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003), "[t]hese two alternatives represent 'extremes of a single continuum,' rather than two separate tests." As explained below, the balance weighs heavily in the plaintiffs' favor on each of the four *Johnson* factors.

### A. Likelihood of Success

The concept of "liberty" assured by the Due Process Clause of the Fourteenth Amendment embraces those rights and freedoms which are "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Palko v. Connecticut*, 302 U.S. 319, 325 (1937) (Cardozo, J.). Among these most fundamental rights and freedoms are those that flow from the First Amendment, including the freedom of speech, *Gitlow v. New York*, 268 U.S. 652, 666 (1925), the freedom "to engage in association for the advancement of beliefs and ideas," *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958) (Harlan, J.), and "the right of qualified voters, regardless of their political persuasion, to cast their votes effectively," *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968).

Ordinarily, state laws which impinge upon such fundamental liberties are automatically subject to strict judicial scrutiny. *See, e.g.*, *Shapiro v. Thompson*, 394 U.S. 618 (1969). The Supreme Court has recognized, however, that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730 (1974). For this reason, the Court has adopted a special balancing test for evaluating due process claims against state election laws, all of which inevitably affect the fundamental rights of political parties, candidates, and voters:

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). Under this test, the level of scrutiny varies on a sliding scale with the extent of the asserted injury. When, at the low end of that scale, the law "imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 788, 788-89 n.9). But when the law places "severe" burdens on the rights of political parties, candidates or voters, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* at 434 (quoting *Norman v. Reed*, 502 U.S. at 289).

Here, the outcome of the case is controlled by *Anderson v. Celebrezze,* 460 U.S. 780 (1983), a case in which the Supreme Court struck down a very similar, though less burdensome ballot-access scheme for independent candidates.

1. *The Character and Magnitude of the Burdens*

7

The ballot-access scheme in Montana burdens "two different, although overlapping kinds of rights-the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.  Both of these rights, of course, rank among our most precious freedoms." *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968).  As the Supreme Court has recognized, "[t]he right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are 'clamoring for a place on the ballot.' *Ibid.*; *Williams v. Rhodes, supra*, 393 U.S., at 31, 89 S.Ct., at 10." *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983). Montana's ballot-access scheme burdens these rights through the cumulative effect of the scheme's early deadline, high signature requirement, and mandatory filing fee.

The March filing deadline – 229 days before the general election – is among the earliest in the country.  Only five states (Idaho, Mississippi, Ohio, Tennessee, and Utah) have a deadline for independent candidates earlier than May, and none of those states have a filing fee and signature requirement as burdensome as Montana's. The early deadline requires candidates to make premature and uninformed decisions about whether to run.  Independent and minor-party candidates often decide to run as a result of their dissatisfaction with the major-party candidates or in response to particular issues arising closer to Election Day.  The early deadline also forces potential candidates to

8

collect signatures at a time when the public and potential petition circulators simply are not focused or energized on elections in the distant future.

The high signature requirement – 9,993 valid signatures for U.S. Senate – is the most burdensome in the country. When compared to the number of votes cast in the last presidential election in the state, a figure that allows apples-to-apples comparison from state to state, Montana's signature requirement for the U.S. Senate is 2.22%. No other state in the nation has a signature requirement that exceeds 1.99% of the votes cast in the last presidential election, and the median requirement is .37%.

The mandatory filing fee – $1,693 for U.S. Senate – is also among the highest in the nation. Many states require no fee at all. Many states that do require fees set them at a nominal level. Many others allow candidates to file petitions in lieu of filing fees. The overwhelming majority of states have filing fees – optional or mandatory – that are well below Montana's.

The cumulative effect of these three burdensome requirements make Montana's ballot-access scheme for independent and minor-party candidates the most burdensome in the nation. Even under the old ballot-access scheme that required no filing fee and had a deadline in June, only one independent candidate for non-presidential statewide office has made it onto the ballot in Montana since 1972. Montana's new scheme, which adds the early deadline and mandatory filing fee, makes virtually impossible for independent and

minor-party candidates for statewide office to get on the ballot. If that isn't a heavy burden, then nothing is.

The new scheme's burdens, moreover, far exceed burdens that the Supreme Court struck down in *Anderson v. Celebrezze*. In that case, presidential candidate John Anderson challenged Ohio's ballot-access scheme for independent candidates. Under Ohio's scheme, the filing deadline was March 20 of the election year – the same date as the deadline under Montana's scheme. 460 U.S. at 783 n.1. Ohio required only 5,000 valid signatures, which is much lower on an absolute and relative basis than Montana's scheme requires. *Id.* And Ohio's filing fee was a mere $100. *See Anderson v. Celebrezze,* 449 F. Supp 121, 141 (D. Ohio 1980), *aff'd* 460 U.S. 780 (1983).

The Ninth Circuit, moreover, recently applied strict scrutiny and struck down a presidential-ballot access scheme for independent candidates that was far less burdensome than Montana's scheme at issue here. In *Nader v. Brewer,* 508 F.3d 1028 (9th Cir. 2008), Arizona's petition deadline was in early June – 146 days before the general election. The number of signatures required was 14,695 – a high absolute number but a much smaller number, relative to the state's population, than Montana requires. (Arizona's population is more than six times the population of Montana.) And there was no filing fee.

Furthermore, the Third, Fourth, Seventh, and Eleventh Circuits have struck down even less burdensome ballot-access schemes for non-presidential

10

independent candidates. *See Lee v. Kieth,* 463 F.3d 763 (7th Cir. 2006) (deadline 323 days; 10% signature requirement; $0 filing fee); *Council of Alternative Political Parties v. Hooks,* 121 F.3d 876 (3d Cir. 1997) (April 10 deadline; 2% signature requirement; $0 filing fee); *New Alliance Party v. Hand,* 933 F.2d 1568 (11th Cir. 1991) (April 6 deadline; 12,033 signature requirement; $0 filing fee); *Cromer v. South Carolina,* 917 F.2d 819 (4th Cir. 1990) (deadline for filing statement of candidacy 200 days; deadline for filing petitions August 1; 5% signature requirement; $0 filing fee). No court of which the plaintiffs are aware has ever upheld a ballot-access scheme as burdensome as Montana's.

Under these circumstances, strict scrutiny should apply.

### 2. *State Interests and Narrow Tailoring*

Because the Montana ballot-access scheme imposes severe constitutional burdens, it must be narrowly drawn to advance a compelling state interest. Although it remains to be seen what interests, if any, the defendant will identify in support of the scheme, the State has no compelling interest in preventing minor-party and independent candidates from running for office by instituting restrictive barriers to being on the ballot. The disparity in requirements for qualified party candidates versus independent and minor-party candidates is arbitrary and unjustified to the point of being unconstitutional.

The Supreme Court held in *Storer v. Brown*, 415 U.S. 724, 736 (1974), that a state has a "compelling" interest in "the stability of its political system." But the Court held more recently that this interest does not extend so far as to permit a state to protect existing parties from competition with independent or third-party candidates. *Anderson*, 460 U.S. at 801-02. Indeed, "[c]ompetition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms." *Id.* at 802 (quoting *Williams*, 393 U.S. at 32). There is thus a critical difference between a legitimate stability interest in avoiding "splintered parties and unrestrained factionalism," *Storer*, 415 U.S. at 736, and an illegitimate stability interest "in protecting the two major political parties," *Anderson*, 460 U.S. at 802. The Montana ballot-access scheme serves the latter and not the former.

The State also cannot justify the ballot-access scheme as necessary to advance its "important" (though not "compelling") interest in requiring candidates to demonstrate "a significant modicum of support" before allowing their names to appear on the ballot. *Jenness v. Fortson*, 403 U.S. 431, 442 (1971). The requirement that potential candidates collect the signatures of at least 5% of the total votes case for the successful candidate for the same office in the last general election far exceeds a demonstration of "a significant modicum of support." Indeed, a political party may become qualified to nominate its candidates by primary election with only 5,000 signatures. Mont.

12

Code Ann. § 13-10-601. Plaintiff Steve Kelly must collect nearly twice as many signatures, 9,993 total, to appear as an independent candidate on the general election ballot. The signature requirement for independent and minor-party candidates places an unconstitutional burden on those candidates.

### B. Threat of Irreparable Harm to the Plaintiffs

Harm is irreparable for purposes of a preliminary injunction when a court would be unable to compensate the plaintiffs adequately if they should ultimately prevail when the case is fully resolved on its merits. *See generally*, 13 James Wm. Moore et al., *Moore's Federal Practice* § 65.22[1][b] (3d ed. 1999). Free-speech restrictions and harms that touch upon the constitutional and statutory rights of political parties, candidates and voters are generally not compensable by money damages and are therefore considered irreparable. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

Part of the reason for this treatment of political and voting harms is the special importance of the right to vote in the American democratic tradition:

> Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.

*Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964); *accord Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live."). Money cannot fully compensate an individual for the loss of a right so fundamental. Part of the reason is also practical: a court simply cannot undo—by means of a special election or otherwise—all of the effects of an invalid election. Tremendous practical advantages accrue to those who win even invalid elections, and a court simply has no way to re-level the playing field.

In this case, the irreparable nature of the threatened injuries to the plaintiffs is obvious. Without an injunction, plaintiff Steve Kelly will be deprived of the opportunity to appear on the general election ballot in November. Likewise, plaintiff Clarice Dreyer, and other Montana voters, will be deprived of the opportunity to vote for their candidates of choice. Injunctive relief after the election would be highly impractical and virtually meaningless. Under these circumstances, the plaintiffs will suffer actual, imminent, and irreparable harm in the absence of preliminary relief.

### C. Balancing the Harms

The third *Johnson* factor requires the Court to consider the potential impact that the requested injunction might have upon the defendant and to

balance that potential with the harms that the plaintiffs could suffer should the request be denied.

While the absence of an injunction would allow the plaintiffs to be unconstitutionally shut out of the political process, the defendant is unlikely to suffer any harm if the injunction is granted. The requested injunction would simply require the defendant to put Plaintiff Steve Kelly on the ballot in the November election.

### D. The Public Interest

The public interest in this case is clear. The requested injunction will ensure that voters in Montana have the opportunity to vote for their candidates of choice. Without it, voter choices will be limited. The public undoubtedly has a vital interest in a broad selection of candidates as well as the conduct of free, fair and constitutional elections. The requested injunction, if granted, would therefore favor the public interest.

### III. CONCLUSION

The Court should grant the plaintiffs' motion for a preliminary injunction.

Respectfully submitted,


  /s/ Elizabeth L. Griffing
ELIZABETH L. GRIFFING
American Civil Liberties Union
     of Montana Foundation, Inc.
P.O. Box 9138
241 E. Alder, Ste B.
Missoula, MT 59801
(406) 830-3009
betsyg@aclumontana.org

/s/ Bryan Sells
BRYAN SELLS
LAUGHLIN McDONALD
American Civil Liberties Union
     Foundation, Inc.
Suite 1440
230 Peachtree Street, NW
Atlanta, GA 30303
(404) 523-2721
bsells@aclu.org

16