MIKE McGRATH
Montana Attorney General
CHRIS D. TWEETEN
Chief Civil Counsel
ANTHONY JOHNSTONE
Assistant Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Telephone:  (406) 444-2026
Fax:  (406) 444-3549

COUNSEL FOR DEFENDANT
  SECRETARY OF STATE

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

### BUTTE DIVISION

| | | |
|---|---|---|
| STEVE KELLY and CLARICE DREYER, | ) ) ) | Cause No. CV-08-25-BU-SEH |
| Plaintiffs, | ) ) ) | **DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFFS' REQUEST FOR PRELIMINARY** |
| v. | ) ) | **INJUNCTION** |
| BRAD JOHNSON, in his official capacity as Secretary of State of the State of Montana, | ) ) ) ) | |
| Defendant. | ) ) | |

Steve Kelly and Clarice Dreyer ("Kelly", "Dreyer", or, collectively "Plaintiffs")

filed this action seeking a declaration that Mont. Code Ann. §§ 13-10-501 to -503 ("the

ballot access statutes or ballot access process") violate the Constitution of the United

States, and an injunction against its enforcement.  They also seek a preliminary injunction requiring that Kelly's name be placed on the 2008 general election ballot as an independent candidate for the United States Senate.  The Secretary of State submits this brief and supporting documentation as opposition to the request for preliminary injunctive relief.

## I.    PRELIMINARY INJUNCTION STANDARDS

To obtain a preliminary injunction, a party must demonstrate:  "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring plaintiff, and (4) advancement of the public interest (in certain cases)," Johnson v. Cal. State  Bd. of Accounting, 72 F.3d 1427, 1430 (9th Cir. 1995), or in the alternative "either 1) a combination of probable success on the merits and the possibility of irreparable injury , or 2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor," F.D.I.C. v. Gardner, 125 F.3d 1272, 1277 (9th Cir. 1977).

Moreover, "[t]here is one additional factor [the court] must weigh.  In cases … in which a party seeks mandatory preliminary relief that goes well beyond maintaining the status quo *pendente lite,* courts should be extremely cautious about issuing a preliminary injunction. Stanley v. University of Southern California, 13 F.3d 1313, 1319 (9th Cir. 1994), quoting Martin v. International Olympic Committee, 740 F.2d 670, 674-75 (9th Cir. 1984).  In this case, because they have not submitted any signatures

before or after the filing deadline, Plaintiffs seek a mandatory injunction requiring that Kelly's name be placed on the ballot.  The effect of such an injunction would not be to preserve the status quo, but rather quite drastically to change it. As noted in Section III below, the result of a preliminary injunction, which Plaintiffs argue is to secure voting rights of some unnamed persons in addition to Plaintiff Dreyer, would likely be to disenfranchise numerous voters, including a substantial number of members of the armed forces serving outside the state of Montana.

The special institutional concerns implicated by last-minute election challenges also warrant caution.  "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls.  As an election draws closer, that risk will increase."  Purcell v. Gonzalez, 127 S. Ct. 5, 7 (2006); see also Nader v. Keith, 385 F.3d 729, 736-37 (7th Cir. 2004) ("it would be inequitable to order preliminary relief in a suit filed so gratuitously late in the campaign season . . . . There are innocents on the other side as well--the people who will be harmed if a last-minute injunction disrupts the Presidential election in [Montana].").  Accordingly, the Court should "be extremely cautious about issuing" the requested injunction.  Stanley, 13 F.3d at 1319.

One final point deserves mention:  the party seeking preliminary relief bears the burden of proof with respect to all factual issues involved in the request.  See Lands Council v. McNair, 2008 U.S. App. LEXIS 13998, at *61 (9th Cir. Idaho July 2, 2008). Plaintiffs have not produced a scintilla of evidence to support their request.  See Am. Party of Tex. v. White, 415 U.S. 767, 790 (1974) (rejecting ballot access claim as

"simply a failure of proof" where "the independent candidates presented absolutely no factual basis in support of their claims that [the law at issue] imposed unduly burdensome requirements.").

## II.    PLAINTIFFS  CANNOT SUCCEED ON THE MERITS.

### A.    Plaintiffs Have Suffered No Redressable Injury To A Protected Legal Interest Because A Declaration Of The Invalidity Of The Ballot Access Statutes Would Revive The Statutes As They Stood Prior To The Election, And Kelly Has Not Complied With The Pre-Amendment Statutes.

Under the "case or controversy" requirement of article III, section 2 of the United States Constitution, Plaintiffs must show facts sufficient to show standing:  (1) a concrete and imminent "injury in fact", (2) a causal connection between the defendants and the alleged injury, and (3) a likelihood that the injury will be redressed by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  "A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit.  In that event, the suit should be dismissed under Rule 12(b)(1)."  Cetacean Cmty. v. Bush, 386 F.3d 1169, 1174 (9th Cir. 2004) (citations omitted).  The requirements of standing frequently blend into one another, C. Wright, A. Miller, E. Cooper, and R. Freer, Federal Practice and Procedure, § 3531.5 at 1085 (Supp. 2008).

In this case, Plaintiffs have satisfied none of these requirements.  However, they most clearly lack standing because Kelly's absence from the ballot is not caused exclusively by the ballot access statutes challenged in this case, but also by his failure to comply with the unchallenged prior statutes that would replace the present ballot access

statutes in the event Plaintiffs' challenges to the present statutes were successful.  Put another way, a grant of the final declaratory and injunctive relief sought in this action would not provide redress for Kelly's absence from the ballot.

Article I, § 4 of the Constitution of the United States reserves to the States the power to establish procedures for the conduct of Congressional elections.  Pursuant to this power, Montana has regulated ballot access by minor party and independent voters for decades.  Two of the ballot access requirements challenged in this case, the number of signatures and the filing fee, have existed for many years.  (Plaintiffs' allegation that no filing fee was required prior to the 2007 amendment, Complt. ¶ 26, is incorrect.  See Mont. Code Ann. § 13-10-503 (2006) (requiring submission of the nominating petitions "plus the required filing fee").)  The third, governing the date by which the signature requirement must be satisfied, was changed by amendment in the 2007 legislative session.  2007 Mont. Laws, ch.  458, § 2.  Since Plaintiffs challenge the cumulative effect of the entire ballot access scheme, their claims necessarily rely upon the ballot access procedure in existence after the 2007 amendment became effective.

Montana law provides that an unconstitutional law was never within the power of the legislature to enact.  Such a law is void ab initio.  Sadler v. Connolly, 175 Mont. 484, 575 P.2d 51 (1978).   Montana therefore follows the rule that when an amended statute is found unconstitutional, the effect is to void the amendment and reinstate the law as it stood before the amendment.  State ex rel. Woodahl v. District Court, 162 Mont. 283, 511 P.2d 3178 (1973).  This principle has been applied previously in the ballot qualification context in Montana.  51 Mont. A.G. Op. 2 (2005), available at:

http://www.doj.mt.gov/resources/opinions2005/51-002.pdf (invalidated state

constitutional amendment on initiative ballot qualification requirements reverts the law

back to as it was prior to the invalid amendment).  Therefore, should the Court agree with

Plaintiffs that the new filing deadline violates the Constitution, under Montana law the

pre-amendment requirements would be reinstated.  Plaintiffs would still be required to

submit the nominating petitions containing sufficient signatures under the ballot access

process prescribed prior to the amendment, a process they do not challenge here.

   Given these preexisting, independent, and unchallenged requirements for ballot

access, Plaintiffs cannot dispute this crucial fact:  Kelly has submitted no signatures at

any time for the 2008 election, and therefore would satisfy neither filing deadline, nor

any signature requirement.  Affidavit of Lisa Kimmet, ¶ 13.

   For standing purposes, a redressable injury consists of an injury to a cognizable

legal interest, caused by the alleged conduct, that the Court can correct through the

granting of the relief requested.  See Lujan, 504 U.S. at 568-71.  Kelly's absence from the

ballot has not been caused solely by the statutes Plaintiffs challenge here, and they "have

produced nothing to indicate" that they would have qualified under the prior ballot access

requirements.  See id., 504 U.S. at 571.  Rather, if he were to succeed in his constitutional

challenge in this case, under Montana law he would have been obligated to qualify for the

ballot under the prior ballot access.  He would not have been eligible under Montana law

to automatic placement on the ballot under any circumstances. Kelly's failure to submit

nomination petitions and sufficient signatures prior to the deadline that would have

applied prior to the amendment to Mont. Code Ann. § 13-10-503 is a sufficient and

independent cause that would prevent Kelly's placement on the ballot under either ballot access process.

Renne v. Geary, 501 U.S. 312 (1992) supports that conclusion.  In Renne, groups of voters and party officials filed suit seeking a declaration that a provision of the California Constitution barring political parties from endorsing non-partisan candidates violated the First Amendment.  The Supreme Court held that standing was absent because the complaint did not challenge a separate California statute that independently barred such endorsements.  Id. at 319.  Applying the same rule here, Plaintiffs lack standing because separate Montana statutes--the 2006 ballot access laws--would independently bar Kelly from the ballot.

Defendant respectfully submits that the Court is not free to craft a remedy that would violate a Montana law that has not been challenged in this case.  The Court cannot provide redress for the alleged injury without violating an independent provision of state law that is not in question in this case.  Under these circumstances, standing is absent, and the Court therefore lacks subject matter jurisdiction.

**B.    Plaintiffs Have Not Shown A Clear Probability Of Success On Their Claim That The Ballot Access Process Violates The Constitution.**

The core of Plaintiffs' claim revolves around the cumulative effect of Montana's signature requirement and the move of the filing deadline from the primary election day to the filling date for other candidates.  He claims that these provisions erect an unconstitutional barrier in the way of independent and minor party candidates.

There is substantial reason to doubt Plaintiffs' claim that the amended filing date is a significant barrier under the circumstances existing in Montana.  Contrary to Plaintiffs' implication that Montana's date is unconstitutional per se, the Supreme Court's decision in Anderson v. Celebrezze, 460 U.S. 780 (1983) is an as-applied case:

> Constitutional challenges to specific provisions of a State's election law . . . cannot be resolved by any "litmus paper test" that will separate valid from invalid restrictions. Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

460 U.S. at 789.  Thus, "[w]hen determining whether a given state's filing deadline unconstitutionally burdens candidates' and voters' rights, a court must examine that state's ballot access scheme in its entirety."  Wood v. Meadows, 207 F.3d 708, 711 (4th Cir. 2000); see also Williams v. Rhodes, 393 U.S. 23, 32-35 (1968).

Following Anderson's own recommended analytical process, and considering the State's ballot access scheme in its entirety, leads to several distinctions between this case and Anderson as well as the other cases on which Plaintiffs rely.  (Plaintiffs have not yet cited or stipulated to the laws of other states on which they base their claim that "Montana's ballot-access scheme for independent and minor-party candidates [is] the

most burdensome in the nation," so the Secretary reserves the right to respond if and when Plaintiffs provide the basis for their assertion.)  These distinctions include:

First, the present case involves a statewide election, not a national one.  Cf. Anderson, 460 U.S. at 803 ("it is important to recognize that *Storer* upheld the State's interest in avoiding political fragmentation in the context of elections wholly within the boundaries of California.  The State's interest in regulating a nationwide Presidential election is not nearly as strong…"); Nader v. Brewer, 531 F.3d 1028, 1038 (9th Cir. 2008) (invaliding ballot access scheme for presidential election, noting "candidates for president are national candidates and thus situated differently from candidates for state offices, or even other federal offices in Arizona").

Second, Montana would allow Kelly to run a write-in campaign as an independent without submitting any signatures at all; he could declare his intent to do so by September 26.  See Mont. Code Ann. § 13-10-211(1).  Cf. Burdick v. Takushi, 504 U.S. 428, 438-439 (1992) ("in light of the adequate ballot access afforded under Hawaii's election code, the State's ban on write-in voting imposes only a limited burden on voters' rights to make free choices and to associate politically through the vote.").

Third, Montana allows Kelly to begin collecting signatures a year before the alleged "harsh Montana winter" he complains of, as there is no date before which a candidate may not collect signatures.  Cf. Lee v. Keith, 463 F.3d 763, 765 (7th Cir. 2006) (Illinois required all signatures to be collected within 90 days of the filing deadline, which was December 15, ***three months earlier*** than Montana's deadline).

Fourth, Montana does not prevent electors from signing more than one candidate petition.  See Mont. Code Ann. § 13-10-502.

Fifth, unlike many of the states discussed by Plaintiffs, Montana has a long history of independent and third-party ballot access; importantly, that history extends back not only under the prior primary election deadline, but also under the earlier primary filing deadline that existed before 1991--the same primary filing deadline at issue here. Kimmet Aff. Ex. A; 1991 Mont. L. Ch. 591, § 8; Mont. Code Ann. § 13-10-601 (ballot access for parties that receive five percent of vote for successful candidate, or collect signatures in that amount or 5,000, whichever is less); cf. Council of Alternative Political Parties v. Hooks, 121 F.3d 876, 881 (3d Cir. N.J. 1997) (invalidating ballot access scheme where third-parties required ten percent of all votes cast, and no group other than Democrats or Republicans had qualified as third parties since 1913).

Sixth, the 2008 campaign started earlier than any other time in history, to the extent that the Montana Republican Party held its presidential nominating caucus on February 5, 2008.  The 2007 Legislature (the same that enacted the deadline at issue) proposed and passed out of the House by wide margins a bill to move the presidential primary to February or March.  See H.B. 797 (2007), available at http://data.opi.mt.gov /bills/2007/billhtml/HB0797.htm (visited September 9, 2008); cf. Anderson v. Celebrezze, 460 U.S. 780, 790-791 (1983) ("At this point [in March] developments in campaigns for the major-party nominations have only begun.").  Thus, a major factual predicate for Anderson's disapproval of a March filing deadline is no longer true.

Plaintiffs further cannot show that Montana's signature requirement, properly understood, is outside the range that other states impose.  Plaintiffs make a significant error in reading the signature requirement they challenge:  they incorrectly claim that Montana law requires "the signatures of at least 5% of the total votes cast for the same office in the last general election."  Actually, the law requires "5% or more of the total vote cast for the successful candidate for the same office at the last general election." Mont. Code Ann. § 13-10-502(2).  The error is significant because the correct threshold is significantly lower than the "total votes cast" standard.  As many as half (actually 50 percent minus one vote) of the votes cast in an election would not count as "votes cast for the successful candidate."  The threshold is lower still compared to the "registered voter" threshold, which even in Montana's relatively high turnout elections amounts to less than two-thirds of registered voters.  See "Montana Voter Turnout," available at: http://sos.mt.gov/elb/Voter_Turnout.asp (last visited Sept. 7, 2008) (the Secretary of State respectfully requests that the Court take judicial notice of the turnout history pursuant to Fed. R. Evid. 201(d)).  In other words, Montana's 5 percent "successful candidate" threshold requires approximately half the number of signatures as the equivalent "total votes cast" threshold (or 2.5 percent), and approximately one-third the number of signatures as the equivalent "registered voter" threshold (or 1.67 percent).  Indeed, the alleged requirement of 9,973 signatures amounts to just 2.45 percent of the 406,505 votes cast in the general election for Senate in 2008, and 1.58 percent of the 630,633 voters registered as of the primary election in 2008.  Id.; Kimmet Aff. ¶¶ 14-16.

Courts repeatedly have upheld similarly low signature thresholds in other states. Am. Party of Tex. v. White, 415 U.S. 767, 788 (1974) (upholding Texas signature requirement of 3 percent and 5 percent of votes cast for governor); Storer v. Brown, 415 U.S. 724, 738 (1974) (California's 5 percent of total votes "as such, does not appear to be excessive"); Id., n.10 (citing cases approving threshold of 3 percent of registered voters); Jenness v. Fortson, 403 U.S. 431, 434 (1971) (upholding Georgia signature requirement of 5 percent of registered voters); Cartwright v. Barnes, 304 F.3d 1138, 1141 (11th Cir. Ga. 2002) (same); Lawrence v. Blackwell, 430 F.3d 368, 375 (6th Cir. 2005) (upholding Ohio's signature requirement of 1 percent of "electors"); Wood v. Meadows, 207 F.3d 708, 713-14 (4th Cir. 2000) (upholding Virginia's signature requirement of one-half of 1 percent of registered voters); Green v. Mortham, 155 F.3d 1332, 1339 (11th Cir. 1998) (upholding Florida primary signature requirement of 3 percent of registered democratic voters); Rainbow Coal. of Okla. v. Okla. State Election Bd., 844 F.2d 740, 747 (10th Cir. 1988) (upholding Oklahoma signature requirement of 5 percent of votes cast for governor or president); Libertarian Party of Florida v. Florida, 710 F.2d 790, 792 (11th Cir. 1983) (upholding Florida signature requirement of 3 percent of registered voters); see also Burdick v. Takushi, 504 U.S. 428, 433-434 (1992) (noting approval of Hawaii ballot access scheme that included signature requirement of 1 percent of registered voters); Council of Alternative Political Parties v. Hooks, 179 F.3d 64, 76-77 (3d Cir. 1999) (Alito, J.) (upholding New Jersey ballot access regulations); Vogler v. Miller, 651 P.2d 1, 5-6 (Alaska 1982) (approving Alaska signature requirement of 1 percent of votes cast).

Plaintiffs' assertion that Montana's signature requirement is "the most burdensome in the country" is founded not on the "apples to apples" comparison Plaintiffs claim, Pls. Br. at 9, but rather on a comparison of apples and oranges.  The votes cast in the "last presidential election" have nothing to do with the calculation of the signature requirement for the Montana Senate race in question, and Plaintiffs' statistics regarding how Montana's requirement compares to the "number of votes cast in the last presidential election" is meaningless.

Indeed, Plaintiffs cannot even decide what kind of fruit they are trying to measure. On page 9 of their brief they refer to a gross comparison of percentages (albeit the wrong ones), while on page 10 of the brief they compare Montana's signature requirement with Ohio's and Arizona's--not on the basis of gross number but rather "relative to the state[s'] population[s]."  Such a metric is not only irrelevant to the state-by-state analysis of interests and burdens required here, but also penalizes Montana's relatively high rate of vote participation.  Plaintiffs apparently intend to submit expert testimony that may or may not make sense out of these comparisons, but as of now no expert disclosure has been made.

Plaintiff has also provided no evidence that the Montana filing fee stands as a significant barrier to ballot access for minor party and independent candidates.  The Complaint contains no allegation that Kelly is unable to pay the filing fee, which is the same as the fee for any other candidate who appears on the Montana Senate ballot. Moreover, not only was Kelly incorrect to allege that the filing fee was a new requirement as of 2007 (Complt. ¶ 26), but he also neglects to mention that the filing fee

is not a "mandatory filing fee" (Pls. Br. at 9) at all; a verified statement that he is unable to pay the filing fee shall be accepted "in lieu of a filing fee."  Mont. Code Ann. § 13-10-203.

Plaintiffs have failed to offer any evidence of a burden, let alone an unconstitutional burden, imposed by Montana's ballot access scheme.  On the other side of the constitutional balance, Montana's interests in setting a uniform filing date for all party and independent candidates include the following:  simplifying the timelines for candidates who wish to appear on the ballot; equalizing the timelines to level the playing field for all Montana candidates and eliminating a double-standard that was perceived as unfair to major-party candidates; reducing the administrative burden on busy election officials in the weeks before the primary to improve the quality of election administration for voters; providing sufficient time and staff to scrutinize petition signatures and avoid error or fraud; allowing for the investigation and judicial resolution of petition or other election challenges; requiring a modicum of community support early in the process; preventing voter confusion by limiting ballot access to serious candidates who can demonstrate some level of political viability; lessening the likelihood of multiple independent candidates appearing on the ballot and diluting the will of the majority; preventing multiple potential major- or third-party candidates from waiting out the primary and appearing as last minute "independent" candidates; encouraging candidates aligned with major- or third-parties to appear on the ballot with those party designations to inform voters; encouraging independent and minor party candidates to reach out early to voters who do not have the benefit of the extended media coverage accorded to some

major party candidates; and responding to increased early interest in politics during an election year with unprecedented early presidential primaries and caucuses, demonstrated by legislative interest in earlier primary dates and the Montana Republican Party's eventual choice of a February 5, 2008 nominating caucus.

All of these interests support Montana's ballot access scheme in light of its experience with candidates and election administration, and some present factual issues which cannot be addressed fully in a response to a preliminary injunction request.  At this stage in the proceedings, however, the Court need not decide how the fact-bound analysis required by Anderson would be resolved.  It is enough to say that Plaintiffs' suggestion that they are certain to succeed on the merits should be viewed with skepticism.


III.    **PLAINTIFFS SHOULD BE DENIED PRELIMINARY INJUNCTIVE RELIEF BECAUSE THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN DEFENDANT'S FAVOR AND THE RELIEF SOUGHT WOULD NOT BE IN THE PUBLIC INTEREST.**

Montana law establishes clear deadlines for the preparation of the general election ballot.  The Secretary of State is required to certify the names of the candidates and the identity of any ballot issues that have qualified for the general election ballot no less than 75 days prior to the date of the general election.  See Mont. Code Ann. § 13-12-201.  This year, that date passed on August 21.  Mont. Code Ann. § 13-21-212 requires the election administrator to have the absentee ballot for a federal election ready to mail out no later than 45 days prior to the election in order to comply with the Montana Absent Uniformed Services and Overseas Elector Act, Mont. Code Ann. tit.13, ch. 21.  For this year, that

date is September 19.  (These dates, and others relating to the election, are summarized by the Secretary of State at:  http://sos.mt.gov/elb/calendar/2008/2008_SOS_and_COPP_ Election_Calendar.pdf (last visited September 9, 2008) (the Secretary of State respectfully requests that the Court take judicial notice of the calendar pursuant to Fed. R. Evid. 201(d)).

Prior to final delivery of the ballots, the local election administrators must format the ballots, return drafts to the Secretary of State for review, <u>see</u> Mont. Code Ann. § 13-12-202 (requiring Secretary of State to prescribe uniform format for ballots), correct any formatting mistakes, and send the ballots to a printer.  As a practical matter the printer requires 7-10 days to deliver printed ballots.  Thus, this year the ballot information must be sent to the printer no later than August 27.  The process then requires discussions among the local election administrators, the Secretary of State's office, and the printer to arrive at a final format for the ballot. The ballots must be delivered to the local election administrators and prepared for distribution to absent military and overseas voters by September 19.  Kimmet Aff. ¶¶ 8-9.

Even when the election administrator complies with this schedule, more than 3 percent of the ballots of Montana military personnel are voted and returned to the election administrator too late to be counted.  Kimmet Aff. ¶ 12.  Any delay in the availability of the ballots would violate Montana statute and increase the risk that Montana's men and women in uniform are unable to participate in the election.

An order from this Court requiring the election administrators to add Lovaas' name to the ballot at this stage would create chaos.  The candidates for United States

Senator are placed in the second position on the ballot, just below the candidates for president and vice president.  Mont. Code Ann. § 13-12-207(1)(b).  The addition of another candidate for United States Senator would therefore require all 56 election administrators in Montana to reformat the ballot not just for the Senate race but also by moving all of the down ballot candidates further down the ballot and re-rotating the names on the ballot to comply with the requirement that all candidates names appear on the top of the ballot for their race roughly the same number of times.  Kimmet Aff. ¶ 10.

Failure to complete all of these tasks due to the late addition of Kelly's name to the ballot would cause the election administrators to be unable to meet the statutory deadlines, would delay delivery of absentee ballots to overseas and military voters and increase the chances that overseas and military votes will not be counted.  Kimmet Aff. ¶¶ 11-12.

Preliminary injunction is an equitable remedy.  Equity favors the vigilant over those who sleep on their rights.  Plaintiffs have produced no evidence that they would suffer material hardship if Kelly's name was not placed on the ballot.  In fact, whatever hardship they might suffer is a result of their own lack of diligence in pursuing this action.  There is also considerable reason to believe they would not suffer any significant hardship.  As shown above, Kelly has no right under state law even to seek status as an independent candidate.

In Nader v. Keith, where the court denied a preliminary injunction filed in August of an election year as "gratuitously late in the campaign season," the Plaintiff had collected 40,000 signatures, arguably enough to qualify had they been validated.

385 F.3d at 736.  Even so, the court refused to grant the relief requested because despite

the great number of signatures collected, many of them would have been invalidated

upon verification.  Compare Mont. Code Ann. § 13-10-503 (requiring verification and

certification of signatures as provided by law).  Simply granting ballot access on the basis

of proffered but unverified signatures was "an improper procedure," and the court noted

that the plaintiff's "proposing it suggests he is pessimistic" that there were the legally

required number of valid signatures.

Plaintiffs' situation in this case is even less compelling than that of the Nader

campaign.  Here, the Plaintiffs have collected no signatures, and thus have not even

attempted to show that Kelly enjoys the legally required level of popular support, let

alone show the validity of any signatures.  As the Court noted in Nader, 385 F.3d 729,

736-37 (7th Cir. 2004), "it would be inequitable to order preliminary relief in a suit filed

so gratuitously late in the campaign season….  There are innocents on the other side as

well—the people who will be harmed if a last-minute injunction disrupts the Presidential

election in [Montana]."

Indeed, Plaintiffs have not cited a single case where a court has mandated ballot

access for a candidate without signatures so close to the general election.  Cf. Anderson

v. Celebrezze, 460 U.S. 780, 782 (1983) ("Anderson's supporters tendered a nominating

petition containing approximately 14,500 signatures and a statement of candidacy to

respondent Celebrezze"); New Alliance Party v. Hand, 933 F.2d 1568, 1571 (11th Cir.

1991) ("Plaintiffs submitted an adequate number of signatures to defendant on June 5,

1990, the date of the major parties' primaries."); Cromer v. South Carolina, 917 F.2d 819,

821 (4th Cir. 1990) (enjoining defendants from declining to accept Plaintiffs' "otherwise regular petition" containing the requisite number of signatures).

A grant of preliminary relief at this stage would raise a very real prospect of delaying the preparation of the final ballot for distribution to overseas electors, including uniformed members of the armed forces.  Such a delay would cause a greater number of these voters to be unable to vote and return their ballots prior to the election.  These non-party voters are the "innocents on the other side" identified in Nader v. Keith, 385 F.3d at 737.  Thus, the real threat of election disruption--due to last-minute compliance with a court order outside of the regular process provided by statute--tilts the balance of hardships decidedly against the Plaintiffs here.  The right to vote "rank[s] among our most precious freedoms."  Williams v. Rhodes, 393 U.S. 23, 30-31 (1968); see also Reynolds v. Sims, 377 U.S. 533, 561-62 (1964).  Plaintiffs' non-existent interest in securing a place on the ballot for Kelly on behalf of his one alleged supporter is surely outweighed by the right of overseas voters to cast their ballots, especially when hundreds of these voters are members of our armed services who risk their lives to protect our constitutional rights, including our right to vote.

Similarly, it cannot serve the public interest to interfere in the orderly process of preparing, mailing, and counting ballots of overseas voters.  States have legitimate interests in the orderly conduct of elections.  Storer v. Brown, 415 U.S. 724, 730 (1974).  Putative candidates who seek to interfere with that interest by seeking injunctive relief literally at the last minute prior to the finalizing of the ballot serves only themselves, not the interests of the public generally.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion for preliminary injunction should be denied.

Respectfully submitted this 9th day of September, 2008.

MIKE McGRATH
Montana Attorney General
CHRIS TWEETEN
Chief Civil Counsel
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401


By: */s/  Anthony Johnstone*
ANTHONY JOHNSTONE
Assistant Attorney General

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 9, 2008, an accurate copy of the foregoing

Defendant's Brief in Opposition to Plaintiff's Request for Preliminary Injunction was

served on the following persons by the following means:

 1, 2, 3         CM/ECF

      1     Clerk, U.S. District Court

      2     Mr. Bryan Sells
              Mr. Laughlin McDonald
              American Civil Liberties Union Foundation, Inc.
              2600 Marquis One Tower
              245 Peachtree Center Avenue, NE
              Atlanta, GA 30303

      3     Ms. Elizabeth L. Griffing
              American Civil Liberties Union of Montana Foundation, Inc.
              241 East Alter, Suite. B
              P.O. Box 9138
              Missoula, MT 59802-9138


DATED: September 9, 2009            */s/ Anthony Johnstone*
                                      ANTHONY JOHNSTONE
                                      Assistant Attorney General
                                      215 North Sanders
                                      P.O. Box 201401
                                      Helena, MT 59620-1401