LAUGHLIN MCDONALD
American Civil Liberties Union Foundation, Inc.
230 Peachtree Street NW, Suite 1440
Atlanta, GA 30303
(404) 523-2721
(404) 653-0331 (fax)
lmcdonald@aclu.org

JENNIFER A. GIUTTARI
American Civil Liberties Union
    of Montana Foundation, Inc.
241 E. Alder, Ste. B
P.O. Box 9138
Missoula, MT 59802
(406) 830-3009
jeng@aclumontana.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | | |
|---|---|---|
| STEVE KELLY and CLARICE DREYER,<br>　　　Plaintiffs,<br><br>　　　　　v.<br><br>LINDA McCULLOCH, in her official capacity as Secretary of State of the State of Montana,<br>　　　Defendant. | ) ) ) ) ) ) ) ) ) ) | Civil No. CV-08-25-BU-SEH |

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

Montana's ballot-access scheme for independent candidates for the United States Senate is by far the most burdensome in the nation.  The scheme's early deadline, high signature requirement, and high filing fee make it all but impossible for such candidates to get on the ballot. In fact, no such candidates have appeared on Montana's ballots since 1936.

Plaintiffs Steve Kelly and Clarice Dreyer claim in this lawsuit that Montana's scheme violates their rights under the First and Fourteenth Amendments to the United States Constitution. They argue, among other things, that the outcome of this case is controlled by *Anderson v. Celebrezze,* 460 U.S. 780 (1983), and *Nader v. Brewer,* 531 F.3d 1028 (9th Cir. 2008), *cert. denied,* 2009 WL 578703 (Mar. 9, 2009) (mem.).  They have moved this Court for summary judgment, and they now respectfully submit this brief in support of that motion.

## I. BACKGROUND

### A. The Statutory Scheme

2

Montana law creates a two-tiered ballot-access scheme for candidates seeking to run for non-presidential offices: one for qualified parties and one for independent candidates.  A qualified party is any party that had a candidate for statewide office who met a certain vote threshold in either of the last two general elections or that submitted a party-qualifying petition meeting the requirements of Mont. Code Ann. § 13-10-601.  (Joint Statement of Undisputed Facts ["JS"] ¶ 17).

Qualified parties nominate their candidates by primary election, and their nominees appear automatically on the general-election ballot.  Mont. Code Ann. § 13-10-201.  In order to appear on the primary-election ballot, candidates seeking the nomination of a qualified party need only to submit a declaration for nomination and pay the filing fee prescribed by Mont. Code Ann. § 13-10-202.  The declaration-for-nomination form does not require the candidate to collect or submit any petition signatures.  Mont. Code Ann. § 13-10-201.   The form is due 75 days before the

primary election at which the candidate seeks to appear on the ballot.  Mont. Code Ann. § 13-10-201; (JS ¶ 18).

Independent candidates, on the other hand, appear on the general-election ballot only if the candidate or party submits a nominating petition meeting the requirements of Mont. Code Ann. §§ 13-10-501 through -503 and pays the filing fee prescribed by Mont. Code Ann. § 13-10-202.  Nominating petitions must contain the signatures of at least 5% of the total votes cast for the successful candidate for the same office in the last general election. Mont. Code Ann. § 13-10-502.  Nominating petitions for independent and minor-party candidates seeking to appear on the general-election ballot are due 75 days before the date of the primary election for qualified parties.  Mont. Code Ann. § 13-10-503.

The Montana Legislature amended the ballot-access scheme for independent and minor-party candidates at the Legislature's regular session in 2007.  S. 270, 2007 Leg., Reg. Sess. (Mont. 2007); (JS ¶ 12).  Prior to the 2007 amendment, the nominating

4

petition deadline was the first Monday in June.  S. 270, 2007 Leg.,
Reg. Sess. (Mont. 2007); (JS ¶ 11).

In 2008 year, the deadline for nominating petitions was March
13, 2008 - exactly 236 days before the general election. For United
States Senate, the number of signatures required was 10,243, and
the filing fee  was $1,693.00.  (JS ¶ 42).  Together, these
requirements make Montana's scheme for independent and minor-
party candidates the most burdensome in the nation.

### B.  The Plaintiffs

Plaintiff Steve Kelly is a United States citizen and a resident of
the State of Montana.  He is a resident and registered voter in
Gallatin County, Montana.  (JS ¶ 1).  He ran for Congress as an
independent candidate in 1994 and desired to run as an
independent or minor-party candidate for United States Senate in
2008.  (JS ¶ 2).

Plaintiff Clarice Dreyer is a United States citizen and a
resident of the State of Montana.  She is a resident and registered

voter in Gallatin County, Montana.  (JS ¶ 3).  She wanted to have the opportunity to vote for Steve Kelly in the 2008 election.

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party is entitled to summary judgment where the evidence and the applicable law permit only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party, which may not rely merely on the allegations or

6

denials in its own pleadings, but must, by affidavits or otherwise as provided in Rule 56, "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *accord Anderson* 477 U.S. at 248. Only genuine disputes over *material* facts – facts that, under the governing law, could affect the lawsuit's outcome –  will properly preclude entry of summary judgment. *Anderson,* 477 U.S. at 248.

In determining whether it is appropriate to grant or deny summary judgment, the court's role is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. *See Anderson,* 477 U.S. at 249. In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

## III.  ARGUMENT

The legal test governing the plaintiffs' claim is clear and undisputed.  This Court must apply the balancing test set forth in *Anderson v. Celebrezze*:

> [A court] must first consider the character and
> magnitude of the asserted injury to the rights protected
> by the First and Fourteenth Amendments that the
> plaintiff seeks to vindicate.  It then must identify and
> evaluate the precise interests put forward by the State as
> justifications for the burden imposed by its rule.  In
> passing judgment, the Court must not only determine
> the legitimacy and strength of each of those interests; it
> also must consider the extent to which those interests
> make it necessary to burden the plaintiff's rights.

*Anderson,* 460 U.S. at 789.  Under this test, the level of scrutiny

varies on a sliding scale with the extent of the asserted injury.

When, at the low end of that scale, the law "imposes only

'reasonable, nondiscriminatory restrictions' upon the First and

Fourteenth Amendment rights of voters, 'the State's important

regulatory interests are generally sufficient to justify' the

restrictions."  *Burdick v. Takushi,* 504 U.S. 428, 434 (1992) (quoting

*Anderson,* 460 U.S. at 788, 788-89 n.9).  But when the law places

severe or discriminatory burdens on the rights of political parties,

candidates or voters, "the regulation must be 'narrowly drawn to

advance a state interest of compelling importance.'"  *Id.* at 434

(quoting *Norman v. Reed,* 502 U.S. at 289).

8

1.  *The Character and Magnitude of the Burdens*

Montana's ballot-access scheme burdens "two different, although overlapping kinds of rights-the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.  Both of these rights, of course, rank among our most precious freedoms."  *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968).  As the Supreme Court has recognized, "[t]he right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are 'clamoring for a place on the ballot.'  *Ibid.*; *Williams v. Rhodes*, *supra*, 393 U.S. at 31, 89 S. Ct., at 10."  *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983). Ballot-access restrictions also burden voters' freedom of association, because an election campaign is a platform for the expression of views on the issues of the day, and a candidate "serves as a rallying point for like-minded citizens."  *Id.* at 787-88.

The plaintiffs here contend that Montana's ballot-access scheme burdens their rights through the cumulative effect of the scheme's early deadline, high signature requirement, and high filing fee.

### a. Filing Deadline

Montana's filing deadline means that the opportunity to run for the United States Senate as an independent candidate is formally cut off in early March, almost eight months before the general election.  This also means, of course, that the opportunity for voters to coalesce around such a candidacy is cut off at the same time.  "History . . . ends" for both independent candidates and their supporters when the early March deadline passes.  *Anderson,* 460 U.S. at 800. As a practical matter, moreover, candidates must actually make their decision well before the deadline in order to gather the more than 10,000 signatures required on nominating petitions and to raise money for the filing fee, the petition drive, and the campaign.  *See id.* at 791 n.11. (See Ex. 6 at 11). This makes

the effective cut-off date for a candidate to enter the race at least several months before the legal deadline.

One of the most widely-recognized ways in which an early effective deadline burdens candidates and voters is by depriving them of the opportunity to respond to developments that occur after the campaign heats up. *See, e.g., Anderson,* 460 U.S. at 790-91; *Nader v. Brewer,* 531 F.3d 1028 (9th Cir. 2008), *cert. denied,* 2009 WL 578703 (Mar. 9, 2009) (mem.); *Cromer v. South Carolina,* 917 F.2d 819, 823-24 (4th Cir. 1990). Candidates rise and fall in popularity. Issues emerge. Positions shift. Scandals happen. The early months of a campaign are rarely static. These changes create opportunities for new candidacies and political coalitions. *See Anderson,* 460 U.S. at 790-91. Oftentimes, moreover, independent candidacies and voter support for such candidacies occur only as a reaction to the particular nominees, or likely nominees, of the existing parties. *Id.* This is certainly true in Montana, where, for example, a prospective independent candidate for the United States Senate could not likely have predicted in November or December of

11

2007 that the Republican Party would nominate Bob Kelleher, a

former member of the Green Party and widely considered a

relatively weak candidate, to oppose the incumbent Senator Max

Baucus.

The Supreme Court and the Ninth Circuit have also

recognized that early filing deadlines burden candidates by making

the business of campaigning more difficult.  *See, e.g., Anderson,*

460 U.S. at 792; *Nader,* 531 F.3d at 1038.  "Volunteers are more

difficult to recruit and retain, media publicity and campaign

contributions are more difficult to secure, and voters are less

interested in the campaign."  *Anderson,* 460 U.S. at 792.  In

Montana, the early effective deadline also means, as a practical

matter, that candidates have to do their signature gathering and

early campaigning in the late fall and winter, when the weather in

Montana is often inclement and a substantial number of voters

relocate to warmer climates.  (See Ex. 6.) Not only are potential

supporters less accessible but signature gathering and

campaigning is more difficult when it's raining or snowing and the

roads are treacherous. (See Ex. 6.) The early deadline also precludes the possibility of gathering signatures at the polls during school elections, which are held in late March, or on primary day in June. (JS ¶ 13).  Both are fertile sources of signatures upon which independent candidates are unable to draw.

Early effective deadlines also burden independents by putting them at a competitive disadvantage in the electoral process.  *See Anderson,* 460 U.S. at 790-91.  The ability to select candidates later in the process gives qualified parties and their supporters "the political advantage of continued flexibility."  *Id.* at 791. For independents, the inflexibility imposed by an early effective deadline "is a correlative disadvantage because of the competitive nature of the electoral process."  *Id.*  The ability to campaign when voters are more interested is a further advantage for qualified-party candidates and a disadvantage for independents.  These burdens, which fall unequally on independent candidates, "discriminate[] against those candidates and – of particular importance – against those voters whose political preferences lie outside the existing

13

political parties." *Id.* at 794. They also strike at core First Amendment values by reducing electoral diversity and the marketplace of ideas. *Id.* In Montana, the qualified parties have until June or later to select their nominees. This gives them more than six months of flexibility that is unavailable to Montana's independent candidates and their supporters. It also allows them to do virtually all of their campaigning in the Spring and Summer.

The magnitude of these burdens is not difficult to gauge. In *Anderson,* the Supreme Court found that a March 20 deadline for independent candidates imposed burdens sufficiently weighty to warrant strict scrutiny. 460 U.S. at 790-95. In *Nader,* the Ninth Circuit concluded that a June 9 deadline for independent candidates imposed a "severe" burden. 531 F.3d at 1039. In *Cromer v. South Carolina,* 917 F.2d 819, 823-24 (4th Cir. 1990), the Fourth Circuit applied strict scrutiny to a March 30 deadline. Montana's deadline, which is earlier than any of these, likewise falls on the "severe" end of the sliding scale.

14

Another way to measure the magnitude of the burden is by looking to past experience.  If Senate candidates have been unable to meet the deadline, then the burden is probably heavy. *See, e.g., Mandel v. Bradley,* 432 U.S. 177, 178 (1977) (criticizing the district court for failing to analyze what the "past experience" under the ballot restriction might indicate about the burdens it imposed); *Storer v. Brown,* 415 U.S. 724, 742 (1974) ("Past experience will be a helpful, if not always unerring, guide" when assessing the burdens imposed by ballot access requirements). Here, there has been only one independent candidate for U.S. Senate in the State's 119 years – Joseph P. Monaghan in 1936, when the petition filing deadline was in October.  (Ex. 1 at 9; JS ¶ 34.)  Since 1973, when the Legislature moved the filing deadline from August to March, there has been only one independent candidate for *any* non-presidential statewide office on the general election ballot.  (Ex. 1 at 11-13; JS ¶ 35.)  Plaintiff Steve Kelly petitioned successfully for ballot access as an independent candidate for the United States House of Representatives in 1994, when the petition filing deadline

15

was in June. (Ex. 12; JS ¶ 36.)  No independent candidates for non-presidential statewide offices have ever been able to get on Montana's ballot when the deadline was in March. (Ex. 1 at 11-13; JS ¶ 35.)  This record of total exclusion is about as heavy as a burden can get.

Yet another way to measure the burden is by comparing Montana's deadline to those in other states.  In absolute terms, Montana's deadline for Senate candidates in 2008 was the third earliest in the nation.  (Ex. 5 at 6-7; JS ¶ 46.)  Only Mississippi (January 11) and Ohio (March 3) had earlier deadlines, but, because both of those states held their party primaries in March, neither of those deadlines gave qualified parties as much of a head start as did Montana's.  (Ex. 5 at 6-7; JS ¶ 47.)  On the other end of the spectrum, twenty-seven states had petition filing deadlines later than June 30. (Ex. 5 at 6-7; JS ¶ 48.)  Eleven states had deadlines in July.  (JS ¶ 49.)  Thirteen states had deadlines in August. Three states had deadlines in September.  (*Id.*)  Only seven states – Idaho, Ohio, Mississippi, Montana, Nevada, Tennessee, and Utah – had

16

deadlines before May 1.  (*Id.*)  When compared to other states, then, Montana is clearly on the extreme end of the distribution.

A fourth way to gauge the magnitude of the burden is through the application of common sense.  Montana's filing deadline is in early March, more than 230 days before the general election at which an independent Senate candidate would hope to appear on the ballot and more than 75 days before the qualified parties have to choose their candidates.  (JS ¶¶ 45-46).  Because Montana also requires an independent candidate to file a nominating petition and pay a filing fee, the effective deadline is even earlier – perhaps as early as a year or more before the election.  By any reasonable standard, that's a long time and one that imposes a severe burden.

Strict scrutiny is also warranted by the discriminatory nature of Montana's early filing deadline.  As the Supreme Court explained in *Anderson*, the burdens of an early deadline discriminate against independent candidates and their supporters.  460 U.S. at 794. In Montana, independent Senate candidates have to turn in petitions containing more than 10,000 signatures exactly one week before

17

candidates seeking the nomination of qualified parties have to turn in a statement of candidacy containing no signatures. Qualified parties then have an additional 75 days to select their candidates. (JS ¶¶ 42, 45). Under the *Anderson* test, these inequalities warrant strict scrutiny no matter how severe the burdens are.

Ultimately, Montana's early filing deadline is so burdensome and so discriminatory that it is probably unconstitutional standing alone. No court of which the plaintiffs are aware has ever upheld a filing deadline for independent candidates that fell so far before the general election, the primary election, and the filing deadline for qualified-party candidates. But Montana's filing deadline does not stand alone, and the Court must also consider the additional effects of Montana's signature requirement and filing fee.

### b. Signature Requirement

Montana's high signature requirement is more than just a number. Because signatures don't collect themselves, a signature requirement acts as a tax on a candidate's human and financial resources. In Montana, the law requires an independent candidate

to collect valid signatures at least equal in number to 5% of the votes cast for the last successful candidate for the office sought. Mont. Code Ann. § 13-10-502.  For would-be Senate candidates in 2008, the minimum number was 10,243 signatures.  (JS ¶ 42). However, because some signatures collected will inevitably turn out to be invalid, a candidate must, as a practical matter, aim to exceed the minimum number by approximately 25%, which would require a Senate candidate to collect approximately 12,800 signatures in order to be reasonably certain of obtaining ballot access. (Ex. 6; JS ¶ 43.)

C.B. Pearson, a longtime political consultant with extensive petitioning experience in Montana, estimates that a petition drive to collect that many signatures before the early March deadline would take somewhere between 854 and 1,067 person-hours of work, which is the equivalent of one person working full time for approximately six months. (Ex. 6; JS ¶ 44.)  If the petition drive were to use paid or volunteer staff, moreover, Pearson adds in an extra 10% to his estimate for administrative tasks.  (JS ¶ 44).  If the

entire drive were to be conducted by paid signature-gatherers, as many are, Pearson estimates the cost to be $25,000 to $50,000, depending on the time of year.  (JS ¶ 44).

That's a heavy burden.  It's a particularly heavy burden for the vast majority of Montanans, like Steve Kelly, who can afford neither to take six months off from work to collect their own signatures nor to pay an outside consultant like C.B. Pearson to collect signatures for them. It's also a burden that falls unequally on independent candidates and their supporters, because qualified parties and their candidates don't have to collect any signatures in order to appear on the ballot.

Past experience further measures the burden.  As already discussed above, there has been only one independent candidate for U.S. Senate in the State's 119 years – Joseph P. Monaghan in 1936, when the petition filing deadline was in October and the number of signatures required was obviously much smaller.  (JS ¶ 34).  That 72-year-old unblemished streak suggests that the burden is heavy indeed.  In addition, no independent candidate for

governor has ever met the signature requirement in the state's entire history.  (JS ¶ 31).  And, in fact, only one independent candidate for any other non-presidential statewide office has ever successfully met the signature requirement to be on the general election ballot.  (Ex. 1 at 12; JS ¶ 35.)  Plaintiff Steve Kelly petitioned successfully for ballot access as an independent candidate for the United States House of Representatives in 1994, when the petition filing deadline was in June and the number of signatures required was somewhat less.  (JS ¶ 36).  This further suggests that Montana's signature requirement falls on the "severe" end of the scale.

When compared to other states, moreover, Montana's signature requirement is the most burdensome in the country.  (JS ¶ 53).  As a ratio of the number of votes cast in the last presidential election in the state, a figure that allows apples-to-apples comparison from state to state,[1] Montana's signature requirement

[1] The number of votes cast serves as a rough estimate of the number of people who are eligible to sign petitions.  Other estimates are possible, and one researcher has used a published estimate of a state's voting-eligible population as the transforming

for the U.S. Senate in 2008 was 2.27%.  (Ex. 5 at 11; JS ¶ 53.)

Thirty-seven states had a signature requirement under 1%. Four

states had no signature requirement at all.  (Ex. 5 at 10; JS ¶ 53.)

The median was .43%. The mean was .63%, and the standard

deviation was also .63%.   Montana's signature requirement was

thus more than 2.6 standard deviations above the mean.  (JS ¶ 53).

Montana's signature requirement is therefore not only the most

burdensome in the country but also far more burdensome than the

average state.

By these measures, Montana's signature requirement

standing alone is burdensome enough to warrant strict scrutiny

under the *Anderson* test.  Strict scrutiny is also warranted by virtue

of the discriminatory nature of the burdens.  It's not clear whether

the signature requirement, standing alone, could pass

constitutional muster following the application of strict scrutiny.

———————————

variable.  *See* Barry C. Burden, *Multiple Parties and Ballot
Regulations, in Democracy in the States* (Bruce Cain et al. eds.
2008).  Choosing a different transforming variable changes the
ratio, but it generally does not affect the rank ordering of states in
any significant way.

But Montana's signature requirement does not stand alone, and the Court must also consider the additional effects of Montana's filing deadline and filing fee.

### c. Filing Fee

Like the signature requirement, Montana's filing-fee requirement acts as a tax on a candidate's resources. The State requires candidates to submit a filing fee equal to 1% of the annual salary of the office sought. (JS ¶ 8). In 2008, the filing fee for the United States Senate was $1,693. (JS ¶ 42).

By common-sense measures, this figure is high, particularly in a state like Montana which ranks near the bottom on state-by-state measures of personal income. (JS ¶ 52.) According to the Census Bureau's 2007 American Community Survey, for example, Montana's median household income of $43,531 ranks 40th out of the 50 states plus the District of Columbia. (*Id.*) Montana's median family income ranks 41st. (*Id.*) The fee is not so high as to exclude everyone, and many candidates in Montana have indeed been able to pay similar amounts. But the fee is certainly high enough to

exclude many potential candidates in Montana, like plaintiff Steve Kelly, who lack both personal wealth and affluent backers and who could not, without substantial hardship, pay the fee from their own resources or modest contributions.

Montana's filing fee also falls on the high end of the scale when compared to other states.  In absolute terms (not taking into account wealth and income variations from state to state), Montana's filing fee for Senate candidates in 2008 was tied with five other states for the third-highest filing fee in the nation. (Ex. 5 at 8-9; JS ¶ 50.)  Thirty-one states had no filing fee at all for independent Senate candidates.  (JS ¶ 50.)  Of the nineteen states that did have filing fees, eight states had fees of $500 or less.  (*Id.*) Montana's filing fee was more than three times the national average of $505. (JS ¶ 50.)  Montana's filing fee is therefore not only burdensome but also far above average on the sliding scale.

Like all other states that have a filing fee, Montana offers a procedure by which a candidate who is unable to pay the fee can nonetheless qualify for the ballot.  A candidate who wants to avoid

the fee can file a verified statement that he or she is unable to pay the fee along with a petition containing signatures from eligible voters numbering 5% of the total votes cast for the successful candidate for the same office in the last general election.  Mont. Code Ann. § 13-10-203 (amended by 2011 Mont. Laws, ch. 242, § 20, effective Jan. 1, 2012); (JS ¶ 8.)  No candidate for non-presidential statewide office has ever successfully avoided the filing fee by petition.

Because the petition in lieu of the filing fee appears to be impossible, Montana's filing fee, standing alone, is of questionable constitutional validity.  *See Lubin v. Panish,* 415 U.S. 709 (1975) (striking down a filing fee of $701.60 in the absence of a reasonable alternative means of gaining access to the ballot).  Montana's filing fee is also higher, at least in absolute terms, than a $1,000 filing fee that the Supreme Court struck down as "patently exclusionary." *Bullock v Carter,* 405 U.S. 134, 143 (1972).  But, again, Montana's filing fee does not stand alone, and the Court must also consider

25

the additional effects of Montana's filing deadline and signature
requirement.

### d. The Cumulative Effect

The cumulative effect of Montana's filing deadline, signature
requirement, and filing fee make Montana's ballot-access scheme
for independent Senate candidates by far the most burdensome in
the nation.   Montana ranks in the top three states on all three
measures and lies at the far highest extreme on one of them.  (JS ¶
56.) **No other state ranks even in the top 15 on all three
measures.** (*Id.*)

The record also shows that the cumulative effect of these
burdens makes it virtually impossible for independent Senate
candidates to get on the ballot.  No such candidates have ever
qualified under the current scheme, and the last such candidate to
qualify for the ballot did so in 1936, when the filing deadline was in
October and there was no filing fee.  (JS ¶ 34.)  If that doesn't
indicate a heavy burden, then nothing does.

26

The cumulative burdens of Montana's ballot-access scheme, moreover, far exceed burdens that the Supreme Court struck down in *Anderson v. Celebrezze*.  In that case, presidential candidate John Anderson challenged Ohio's ballot-access scheme for independent candidates.  Under Ohio's scheme, the filing deadline was March 20 of the election year – the same date as the deadline under Montana's scheme.  460 U.S. at 783 n.1.  Ohio required only 5,000 valid signatures, which is much lower on an absolute and relative basis than Montana's scheme requires.  *Id.* And Ohio's filing fee was a mere $100.  *See Anderson v. Celebrezze,* 449 F. Supp. 121, 141 (D. Ohio 1980), *aff'd* 460 U.S. 780 (1983). *Anderson* thus requires the application of strict scrutiny here.

The Ninth Circuit also applied strict scrutiny and struck down a ballot-access scheme for independent candidates that was far less burdensome than Montana's scheme at issue here.  In *Nader v. Brewer,* 508 F.3d 1028 (9th Cir. 2008), Arizona's petition deadline was in early June – 146 days before the general election.  The number of signatures required was 14,695 – a high absolute

27

number but a much smaller number, relative to the state's population, than Montana requires. (Arizona's population is more than six times the population of Montana.) And there was no filing fee. *Nader* likewise requires the application of strict scrutiny in this case.

Furthermore, the Third, Fourth and Eleventh Circuits have also struck down arguably less burdensome ballot-access schemes for non-presidential independent candidates. *See Council of Alternative Political Parties v. Hooks,* 121 F.3d 876 (3d Cir. 1997) (April 10 deadline; 2% signature requirement; $0 filing fee); *New Alliance Party v. Hand,* 933 F.2d 1568 (11th Cir. 1991) (April 6 deadline; 12,033 signature requirement; $0 filing fee); *Cromer v. South Carolina,* 917 F.2d 819 (4th Cir. 1990) (deadline for filing statement of candidacy 200 days; deadline for filing petitions August 1; 5% of registered voters signature requirement; $0 filing fee). No court of which the plaintiffs are aware has ever upheld a ballot-access scheme as burdensome as Montana's.

Under these circumstances, strict scrutiny should apply.

### 2.  State Interests and Narrow Tailoring

Because Montana's ballot-access scheme imposes severe and discriminatory constitutional burdens, it must be narrowly drawn to advance a compelling state interest.  *Burdick v. Takushi,* 504 U.S. 428, 434 (1992).  This step in the *Anderson* test requires the Court to: (1) "determine the legitimacy and strength of each of [the state interests asserted to justify the challenged scheme];" and (2) "consider the extent to which those interests make it necessary to burden the [plaintiffs'] rights." *Anderson,* 460 U.S. at 789.  The defendant bears the burden of proof on both of these elements. *Burson v. Freeman,* 504 U.S. 191, 199 (1992); *Lopez Torres v. New York State Bd. of Elections,* 462 F.3d 161, 203 (2d Cir. 2006), *rev'd on other grounds* 128 S. Ct. 791 (2008); *Patriot Party v. Allegheny County Dept. of Elections,* 95 F.3d 253, 267-68 (3d Cir. 1996); *see, e.g.. Nader v. Brewer,* 531 F3d 1028, 1039-40 (9th Cir. 2008).

Although it remains to be seen what interests, if any, the defendant will actually identify in support of the scheme, the State offered a laundry list of justifications in its discovery responses and

in its briefing on the plaintiffs' motion for a preliminary injunction.
(Ex. 1.) One thing, however, is certain: no court has ever found any
of the interests asserted on the State's laundry list to be legitimate
or compelling.  Indeed, were this Court to do so, it would be
breaking new ground.

One way to assess the necessity of Montana's ballot-access
restrictions is by reference to other states.  *See Williams v. Rhodes,*
393 U.S. 23, 33 (1968).  The fact that no other state has found it
necessary to impose anything close to the cumulative burdens
associated with Montana's filing deadline, signature requirement,
and filing fee is a strong indication that Montana's scheme fails
strict scrutiny.

Yet another way to measure the state's potential justifications
is by reference to other aspects of Montana law.  The state allows
any group of citizens to qualify a new political party for the ballot
with only 5,000 signatures.  Mont. Code. Ann. § 13-10-601; (JS ¶
17.)  Qualification allows the party to run candidates for as many
offices as it wants, without having to collect any additional

30

signatures for each candidate.  Because the State has apparently deemed 5,000 signatures to be sufficient to serve as a gatekeeper to the ballot for political parties and an unlimited number of candidates, the much higher signature requirement for a single independent Senate candidate seems without justification.   *Cf. Citizens to Establish a Reform Party v. Priest,* 970 F. Supp. 690, 699 (E.D. Ark.1996) (holding that a state could not require more signatures of a new party than an independent candidate).

Under these circumstances, Montana's ballot-access scheme for independent Senate candidates should fail strict scrutiny.

## IV.  SUMMARY AND CONCLUSION

Summary judgment is appropriate here because *Anderson* and *Nader* permit only one conclusion.  The cumulative burdens of Montana's filing deadline, signature requirement, and filing fee far exceed the burdens at issue in either of those cases.  Given the severity and discriminatory nature of the burdens here, Montana will be unable to assert a legitimate and sufficiently compelling state interest to justify the scheme.  Certainly, the interests that the

31

defendant has asserted thus far fall well short of that goal.

*Anderson* and *Nader* thus leave no genuine issues of material fact
to be resolved at trial.

Accordingly, the Court should grant the plaintiffs' motion for
summary judgment.

Respectfully submitted,

/s/ Jennifer Giuttari
JENNIFER GIUTTARI
American Civil Liberties Union
        of Montana Foundation, Inc.
P.O. Box 9138
241 E. Alder, Ste B.
Missoula, MT 59801
(406) 830-3009
jeng@aclumontana.org

/s/ Laughlin McDonald
LAUGHLIN McDONALD
American Civil Liberties Union
        Foundation, Inc.
Suite 1440
230 Peachtree Street, NW
Atlanta, GA 30303
(404) 523-2721
lmcdonald@aclu.org

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), the undersigned counsel certifies that this brief complies with the word limit of Local Rule 7.1(d)(2)(A).  Exclusive of the caption and certificates of service and compliance, the brief contains 5,330 words.

/s/ Laughlin McDonald