STEVE BULLOCK
Montana Attorney General
JENNIFER ANDERS
Assistant Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Telephone: (406) 444-2026
Fax: (406) 444-3549
janders@mt.gov

COUNSEL FOR DEFENDANT
  SECRETARY OF STATE

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

## BUTTE DIVISION

| | | |
|---|---|---|
| STEVE KELLY and CLARICE DREYER, | ) ) ) | Cause No. CV-08-25-BU-SEH |
| | ) | **SECRETARY OF STATE'S** |
| Plaintiffs, | ) | **COMBINED OPENING AND** |
| | ) | **ANSWER BRIEF** |
| v. | ) ) | |
| LINDA MCCULLOCH, in her official capacity as Secretary of State of the State of Montana, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................. iii

FACTS .................................................................................................. 1

I.     ELECTION ADMINISTRATION IN MONTANA ............................... 1

II.    HISTORY OF BALLOT ACCESS IN MONTANA ............................. 3

     A.    The Early Era of Ballot Access:  1889-1968 ................................ 3

     B.    The Modern Era of Ballot Access:  1969-2009 ............................ 4

III.    THE 2008 ELECTION .......................................................................... 6

ARGUMENT ......................................................................................... 6

I.     MONTANA'S BALLOT ACCESS LAWS ARE
     CONSTITUTIONAL. ......................................................................... 7

     A.    Plaintiffs Have Shown No Actual Burden on Good Faith
          Candidates .................................................................................. 8

          1.    The Filing Deadline Is No Barrier to Ballot Access ........... 10

          2.    Good Faith Candidates Meet the Signature
              Requirement. ..................................................................... 12

          3.    The Filing Fee Does Not Burden Candidates Who
              Cannot Pay. ....................................................................... 15

          4.    The Cumulative Effect of the Ballot Access Laws is
              Not a Severe Burden. ........................................................ 16

**TABLE OF CONTENTS (Cont.)**

a.  Plaintiffs do not consider the law in its entirety. ...... 17

b.  Mr. Kelly has multiple paths to ballot access........... 18

c.  Montana has a strong history of ballot access.......... 20

B.  Montana's Ballot Access Laws Serve Compelling Interests. ....... 22

1.  Montana's Ballot Access Laws Prevent Voter Confusion and Promote Voter Education. ......................... 23

2.  Montana's Ballot Access Laws Preserve Political Stability. .......................................................... 26

3.  Montana's Ballot Access Laws Protect the Integrity of the Election Process. ....................................... 28

CONCLUSION ............................................................ 31

CERTIFICATE OF SERVICE ...................................... 32

CERTIFICATE OF COMPLIANCE ............................. 33

# TABLE OF AUTHORITIES

## CASES

Alaska Independence Party v. Alaska,
   545 F.3d 1173 (9th Cir. 2008) ........................................................8

American Party of Tex. v. White,
   415 U.S. 767 (1974) ..........................................................13, 23, 28

Anderson v. Celebrezze,
   460 U.S. 780 (1983) ...................................................................9

Andress v. Reed,
   880 F.2d 239 (9th Cir. 1989) .......................................................13

Big Spring v. Jore,
   109 P.3d 219 (2005) .................................................................28

Browne v. Bayless,
   46 P.3d 416 (2002) ..................................................................29

Bullock v. Carter,
   405 U.S. 134 (1972) .............................................................16, 27

Burdick v. Takushi,
   504 U.S. 428 (1992) .............................................................10, 26

Caruso v. Yamhill County,
   422 F.3d 848 (9th Cir. 2005) .......................................................22

Coalition for Free & Open Elections v. McElderry,
   48 F.3d 493 (10th Cir. 1995) .......................................................18

Council Alternative Political Parties v. Hooks,
   121 F.3d 876 (3d Cir. 1997) ........................................................21

## **TABLE OF AUTHORITIES (Cont.)**

Crawford v. Marion County Election Bd.,
   553 U.S. 181 (2008) ..................................................................8, 29

Cromer v. South Carolina,
   917 F.2d 891 (4th Cir. 1990) ..........................................................21

Fishbeck v. Hechler,
   85 F.3d 162 (4th Cir. 1996) ......................................................12, 20

Green v. Mortham,
   155 F.3d 1332 (11th Cir. 1998) ................................................15, 17

Green v. Mortham,
   989 F.Supp. 141 (M.D. Fla. 1998) ............................................18, 20

Illinois State Board of Elections v. Socialist Workers Party,
   440 U.S. 173 (1979) .......................................................................25

Jenness v. Fortson,
   403 U.S. 431 (1971) ................................................................passim

Kelly v. McCulloch,
   2010 U.S. App. LEXIS 26819 ...........................................................1

Lawrence v. Blackwell,
   430 F.3d 368 (6th Cir. 2005) ...........................................................13

Libertarian Party of Florida v. Florida,
   710 F.2d 790 (11th Cir. 1983) ...................................................12, 14

Libertarian Party v. Herrera,
   506 F.3d 1303 (10th Cir. 2007) ..................................................9, 18

Libertarian Party v. Munro,
   31 F.3d 759 (9th Cir. 1994) .............................................................29

iv

**TABLE OF AUTHORITIES (Cont.)**

Lubin v. Panish,
   415 U.S. 709 (1974) ....................................................................27

Montana Democratic Party v. Eaton,
   581 F.Supp.2d 1077 (2008) ........................................................30

Montanans for Justice v. State,
   146 P.3d 759 (2006) ...................................................................30

Munro v. Socialist Workers Party,
   479 U.S. 189 (1986) ..............................................................23, 24

New Alliance Party v. Hand,
   933 F.2d 1568 (11th Cir. 1991) ..................................................21

Nader v. Brewer,
   531 F.3d 1028 (9th Cir. 2008) ....................................................21

Nader v. Keith,
   385 F.3d 729 (2004) ..............................................................28, 29

Rainbow Coalition of Oklahoma v. Oklahoma State Election Bd.,
   844 F.2d 740 (10th Cir. 1988) .............................. 11, 13, 14, 29

Socialist Workers Party v. March Fong Eu,
   591 F.2d 1252 (9th Cir. 1978) ....................................................19

Stevenson v. State Bd. of Elections,
   794 F.2d 1176 (7th Cir. 1986) ....................................................19

Storer v. Brown,
   415 U.S. 724 (1974) ....................................................................27

Swanson v. Worley,
   490 F.3d 894 (11th Cir. 2007) ...............................................passim

## TABLE OF AUTHORITIES (Cont.)

Washington State Grange v. Washington State Republican Party,
   552 U.S. 442 (2008) ....................................................................................7

Williams v. Rhodes,
   393 U.S. 23 (1968) .....................................................................................27

Wood v. Meadows,
   207 F.3d 708 (4th Cir. 2000) .................................................................passim

## **OTHER AUTHORITIES**

Montana Code Annotated
   §§ 7-4-2611, -13 .......................................................................... 1
   § 13-1-107 ..................................................................................... 2
   § 13-1-301 ..................................................................................... 1
   § 13-2-304 ..................................................................................... 2
   § 13-10-201 ................................................................................... 1
   §§ 13-10-201(6), -503 ............................................................. 2, 16
   § 13-10-202(3) ............................................................................. 15
   § 13-10-203 .................................................................................. 16
   § 13-10-203(2) .............................................................................. 15
   § 13-10-502 .................................................................................. 25
   § 13-10-502, -601 ........................................................................ 12
   § 13-10-503 (2005) ...................................................................... 30
   § 13-10-503 (1993) ...................................................................... 15
   § 13-10-503(1) .............................................................................. 12
   § 13-10-503(2) .............................................................................. 16
   § 13-10-601(2)(b) ......................................................................... 25
   § 13-13-212 ................................................................................... 1
   § 13-13-222 ................................................................................... 2
   § 13-17-104 ................................................................................... 2
   § 13-17-212 ................................................................................. 29
   § 13-27-301 ................................................................................... 2
   § 13-27-303 ................................................................................. 20

## **TABLE OF AUTHORITIES (Cont.)**

Montana Election Laws of 1889

1889 Mont. Election Laws § 5 ........................................................ 3
1895 Mont. Pol. Code §§ 1310, 1316 .......................................... 3
1895 Mont. Pol. Code §§ 1313 ..................................................... 3
1912 Initiative §§ 8, 11, 13 ........................................................... 3
1927 Mont. Laws ch. 7 § 1 ........................................................... 4
1933 Mont. Laws ch. 28, § 1 .................................................. 4, 18
1969 Mont. Laws ch. 368, § 78, 80 .............................................. 4
1973 Mont. Laws ch. 237, § 1 ...................................................... 5
1979 Mont. Laws ch. 571, § 85 ............................................... 5, 15
1979 Mont. Laws ch. 571, § 88 ..................................................... 5
1991 Mont. Laws ch. 591, § 8 ....................................................... 5
1993 Mont. Laws ch. 28 ch. 28 § 1 ............................................. 15
1999 Mont. Laws ch. 151 § 1 ........................................................ 2
1999 Mont. Laws ch. 192, § 2 ....................................................... 5
2005 Mont. Laws ch. 286, § 1 ....................................................... 2
2007 Mont. Laws ch. 458, § 2 ....................................................... 5

H.B. 797 (2007), available at http://data.opi.mt.gov
    /bills/2007/billhtml/HB0797.htm .......................................... 24

Federal Rules of Civil Procedure
Fed. R. Civ. P. 56(c) ..................................................................... 1
Fed. R. Civ. P. 7(b)(1)(C) ............................................................. 8

United States Code
42 U.S.C. § 15302 ....................................................................... 29
42 U.S.C. § 15481 ....................................................................... 29
42 U.S.C. § 1973ff-2(e), (f) ......................................................... 29

Uniformed and Overseas Citizens Absentee Voting Act of 1986 ..................... 29

R. Winger, Ballot Access News, Dec. 1, 2008, available at http://www.
    ballot-access.org/2008/120108.html#11 (visited Apr. 27, 2009) .................. 18

## FACTS

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The following facts are updated to reflect the parties' Joint Statement of Undisputed Facts (Doc. 111) and the Ninth Circuit's Memorandum Opinion of December 10, 2010, declaring that Kelly and Dreyer have standing, and remanding the case to allow consideration of the merits. Kelly v. McCulloch, 2010 U.S. App. LEXIS 26819 (D. Mont. 12/10/10).

## I.   ELECTION ADMINISTRATION IN MONTANA

Elections in Montana generally are administered by the clerks of Montana's 56 counties. Mont. Code Ann. § 13-1-301. In addition to their daily duties as clerks and recorders, Mont. Code Ann. §§ 7-4-2611, -13, county election administrators spend more than a year preparing for general elections. J.S. Undisp. Facts ¶¶ 20-21; Kimmet Aff., Ex. A.

Beginning in January, and again in July, election administrators process address confirmation forms for Montana's 206,798 absentee voters. Mont. Code Ann. § 13-13-212; J.S. Undisp. Facts ¶ 21; Kimmet Aff. ¶ 21. Candidate filings begin on January 22. Mont. Code Ann. § 13-10-201. Candidate and minor party

petitions can be counted by election administrators during this relatively quiet period before the petition filing date of March 20.  Mont. Code Ann. §§ 13-10-201(6), -503; J.S. Undisp. Facts ¶ 22; Kimmet Aff. ¶ 8, 19.

After the candidate filing deadline closes, election administrators must complete at least 27 tasks in preparation for the primary election that takes place less than eleven weeks later.  Mont. Code Ann. § 13-1-107; J.S. Undisp. Facts ¶ 23; Kimmet Aff. ¶¶ 15-23.  The legislature provided for "no-excuse" absentee voting in 1999.  1999 Mont. Laws ch. 151, § 1; Mont. Code Ann. § 13-13-222. The legislature provided for late registration in 2005.  2005 Mont. Laws, ch. 286, § 1; Mont. Code Ann. § 13-2-304; J.S. Undisp. Facts ¶ 24.

As soon as the county canvass is over, assuming there is no litigation, election administrators must shift their focus to initiatives.  The deadline for submission of initiative petitions is June 20.  Mont. Code Ann. § 13-27-301.  In June and July election administrators have to verify and certify more than 120,000 signatures before a filing deadline of July 18.  Mont. Code Ann. § 13-17-104; J.S. Undisp. Facts ¶ 25; Miller Aff. ¶ 18.

In August, election administrators return to ballot preparation for the general election.  As the Secretary showed at the preliminary injunction stage, these steps, and their parallels at the primary election stage, are critical and time sensitive. J.S. Undisp. Facts ¶ 26; 9/9/08 Kimmet Aff.; Kimmet Aff. ¶ 27.

## II.   HISTORY OF BALLOT ACCESS IN MONTANA

Since statehood in 1889, more than 200 statewide third-party and independent candidates have qualified for the general election ballot, and many more have qualified for state legislative races.  J.S. Undisp. Facts ¶ 32; Miller Aff., Exs. B-D.  Historically, Montana law has provided two well-worn paths for these candidates.  A candidate could form a new party or run as an independent. Candidates also could campaign for write-in votes.

### A.     The Early Era of Ballot Access:  1889-1968

Montana's first codification provided that minor party candidates could be nominated in a primary meeting by filing a certificate of nomination at least 30 days before the election.  1895 Mont. Pol. Code §§ 1310, 1316 (these session laws reproduced in the appendix of legal authorities).  Candidates could petition with 5% of the number of votes cast for the successful candidate for the same office at the prior election, filed on the deadline for other certificates of nomination.  1895 Mont. Pol. Code §§ 1313.  The precodification law, superseded by the 1895 Code, required an absolute number of signatures (100 for statewide races).  1889 Mont. Election Laws § 5; see generally, J.S. Undisp. Facts ¶ 7.

The direct primary initiative of 1912 required all parties to nominate by election rather than by convention, with separate petitions required for each candidate.  1912 Initiative §§ 8, 11, 13.  Later, minor parties that had not received

at least 3% of the statewide vote were exempted from the direct primary requirement.  1927 Mont. Laws, ch. 7, § 1.  Soon after, the Legislature expanded a 1% of office salary filing fee to all candidates appearing on the general election ballot.  1933 Mont. Laws, ch. 28, § 1; J.S. Undisp. Facts ¶ 8.

Candidates outside of the two major parties thrived during the first fifty years of statehood, regardless of multiple changes to the ballot access laws. Donovan Rpt. at 20-28, fig. 1; Miller Aff. Ex. B.  Several statewide independent candidates qualified (J.W. Lewis in 1900, C.W. Tenney in 1916, Joseph Monaghan in 1936, Ed Shields in 1940).  Id.  Most candidates, however, established a pattern that would repeat itself to this day:  they chose the minor party route under 15 different banners by 1936.  Id.  After World War II, these third-party and independent candidates disappeared without any significant changes in ballot access laws.  Donovan Rpt. at 25.  Between 1952 and 1968 only 3 candidates in 49 statewide races came from outside of the 2 major parties.  Miller Aff. Ex. B.

**B.**    **The Modern Era of Ballot Access:  1969-2009**

The Legislature generally revised the election laws in 1969, and required third parties to show support under the same 5% rule for independent candidates, unless a party's candidate received votes equal to 3% of the vote for governor at the last election.  1969 Mont. Laws, ch. 368, § 78, 80.  In the 1970s, the Legislature harmonized the filing deadlines for independent and previously

unqualified minor party candidates with the deadline for candidates in the primary. 1973 Mont. Laws, ch. 237, § 1.  A 1979 recodification reinstated the filing fee, which was temporarily omitted in the 1973 revision, and required signatures to be submitted one week before the filing deadline.  1979 Mont. Laws, ch. 571, § 85; J.S. Undisp. Facts ¶ 8.  The recodification also raised the minor party qualification threshold to 5% of votes for governor in the last election.  1979 Mont. Laws, ch. 571, § 88.

Under these rules, substantially the same as the rules currently in place, state ballots experienced a resurgence in minor party and independent candidates. Miller Aff. Exs. B-D; Donovan Rpt. at 22, 29, figs. 2, 4.  The Legislature further liberalized ballot access in the 1990s, temporarily pushing back the filing deadline for independent candidates to the day before the primary election.  1991 Mont. Laws, ch. 591, § 8; J.S. Undisp. Facts ¶ 11.  The Legislature later provided a maximum of 5,000 signatures needed for a previously unqualified minor party. 1999 Mont. Laws ch. 192, § 2.  In 2007, the Legislature restored the harmonized deadline for all candidates.  2007 Mont. Laws ch. 458, § 2; J.S. Undisp. Facts ¶ 12.

Over 200 minor party and independent candidates for state offices have qualified for the ballot in Montana since 1970.  J.S. Undisp. Facts ¶ 32; Miller Aff. Exs. B-D; Donovan Rpt. at 22, 29, figs. 2, 4.  Forty-six of those candidates appeared on the ballot for a statewide non-presidential office.  Miller Aff., Ex. B;

four different minor parties qualified ten candidates with six different petitions under the same late March deadlines at issue here.  Miller Aff. ¶ 13.

Since 1972, 39 out of 44 independent candidates for state office who petitioned for ballot access qualified (another candidate withdrew).  Miller Aff., Ex. D.  Out of 103 statewide non-presidential races, only three independent candidates have attempted to qualify.  J.S. Undisp. Facts ¶ 39; Miller Aff., Exs. B, D.  All three filed in 1994, when Mr. Kelly qualified as a candidate for Congress with 11,666 signatures, and two others failed to qualify with far fewer signatures.  J.S. Undisp. Facts ¶ 39; Miller Aff. ¶ 13.  Mr. Kelly later ran as a Democrat for United States House in 2002.  J.S. Undisp. Facts ¶ 38; Miller Aff. ¶ 6.  Both independent candidates for state legislative races in 2008 qualified; no independent candidate has failed to qualify since Mr. Kelly qualified in 1994.  Miller Aff. Ex. D.

## III.    THE 2008 ELECTION

The facts pertaining to the 2008 election can be found in the parties' Joint Statement of Undisputed Facts ¶¶ 42-64.

## <u>ARGUMENT</u>

Originally, this case appeared to be a challenge to a particular enactment of

the 2007 Montana Legislature, Compl. ¶¶ 25-29.  Since then, Mr. Kelly has not

specified the laws he challenges, will not concede that Montana's ballot access

laws have ever been constitutional, and cannot explain what a constitutional ballot

access law in Montana would look like.  Kelly's Interrog. Resps. 8-11.  He refuses

to concede the constitutionality of the law under which he previously qualified as a

statewide independent candidate in 1994.  Kelly's RFA Resp. 21.  This broadside

attack on 100 years of law and history fails because Plaintiffs have shown no

actual burden on good faith candidates, and because Montana's ballot access laws

serve compelling state interests.

## I.      MONTANA'S BALLOT ACCESS LAWS ARE CONSTITUTIONAL.

In order for Plaintiffs to succeed in their facial challenge to "Montana's

ballot access scheme," Compl. Prayer (3), they must prove that "the law is

unconstitutional in all of its applications."  <u>Washington State Grange v.</u>

<u>Washington State Republican Party</u>, 552 U.S. 442, 449 (2008).  As the Supreme

Court recently noted, "[f]acial challenges are disfavored for several reasons:"  like

Kelly's claims they "rest on speculation," ask for "a rule of constitutional law

broader than is required by the precise facts," and "prevent[] laws embodying the

will of the people from being implemented in a manner consistent with the

Constitution."  <u>Id.</u> (citations omitted).

A ballot access law that has allowed hundreds of minor party and independent candidates to qualify cannot be "unconstitutional in all of its applications." Id. at 1190.  Given the rarity of candidates failing to qualify, "it is not possible to quantify either the magnitude of the burden on this narrow class of [candidates] or the portion of the burden imposed on them that is fully justified." Crawford v. Marion County Election Bd., 553 U.S. 181, 200 (2008); Donovan Rpt. at 35 n.67 (26 of 32 Senate races in 2008 had no independent candidate).

Even if Montana law burdened Mr. Kelly in particular, "these challenges would be properly brought on an as-applied, not facial, challenge." Alaska Independence Party v. Alaska, 545 F.3d 1173, 1181 (9th Cir. 2008).  Yet Mr. Kelly's lack of a cognizable injury deprives this Court of any basis to assess the ballot access laws as-applied to him:  an as-applied challenge cannot succeed as applied to a candidate who did not run.

Thus, the posture of this case as Mr. Kelly has brought it poses an insurmountable bar to his claims.  Should the Court entertain Mr. Kelly's speculative assertions about the burdens Montana law would have imposed on him had he been a good faith candidate, however, it should find those burdens reasonable and justified.

### A.   Plaintiffs Have Shown No Actual Burden on Good Faith Candidates.

"Constitutional challenges to specific provisions of a State's election

laws . . . cannot be resolved by any 'litmus paper test' that will separate valid from invalid restrictions." Anderson v. Celebrezze, 460 U.S. 780, 789 (1983). Instead, a court "must first consider the character and magnitude of the asserted injury." Id. Thus, "a court must examine that state's ballot access scheme in its entirety." Wood v. Meadows, 207 F.3d 708, 711 (4th Cir. 2000).

Mr. Kelly has offered no evidence of a burden on any candidate. Instead, he offers a speculative "litmus-paper test" cautioned against in Anderson. A state should win summary judgment where "[t]he candidates themselves did not attempt to obtain the signatures and therefore proffered no testimony as to the burdens the requirement placed on them," and "[a]ffidavits from other similarly situated minor party candidates, such as the Green Party, were not obtained to prove the burden imposed by the candidate petition was severe." Libertarian Party v. Herrera, 506 F.3d 1303, 1309-10 (10th Cir. 2007).

Instead of showing an actual burden on good faith candidates, Mr. Kelly engages experts to hypothesize burdens with no experience petitioning for ballot access under the laws at issue or under similar circumstances. See Winger Aff. at 12; Pearson Aff. at 1-2. Meanwhile, hundreds of minor parties and independent candidates have achieved ballot access. Miller Aff., Ex. B; Donovan Rept. at 29, fig. 4. Other petitioners have repeatedly gathered signatures at rates that would qualify any good faith candidate under the laws at issue. Mitchell Aff., ¶¶ 4-6;

Singer Aff., ¶¶ 4-5; Miller Aff., ¶¶ 13, 18, 23.  The only comprehensive empirical analysis of ballot access rates before the Court shows no significant or substantial burden imposed by Montana law.  See generally Donovan Rpt.

> **1.**    **The Filing Deadline Is No Barrier to Ballot Access.**

Since 1973, the independent candidate filing deadline has coincided with the primary filing deadline for more than half the election years, and the minor party filing deadline has done so every election year.  See Mont. Code Ann. § 13-10-503.  The "past experience" under these deadlines has been a steady stream of minor party and independent candidates.  Cf. Plfs.' Br. at 15.  The fact that most of these candidates did not choose to run as independents for U.S. Senate says nothing about the ballot access law "in its entirety."  Wood, 207 F.3d at 711.

It is true, but irrelevant, that the filing deadline falls too soon for a prospective candidate to have predicted, for example, "that the Republican Party would nominate Bob Kelleher."  Plfs.' Br. at 12.  Mr. Kelly has no right to "make[] a late rather than an early decision to seek independent ballot status."  Burdick v. Takushi, 504 U.S. 428, 437 (1992).  Moreover, Mr. Kelly's main opponent would have been Sen. Baucus, whose prospects were clear nearly five years before the filing deadline.  Miller Aff., Exs. E, F; Donovan Rpt. at 18.

Plaintiffs also claim that a March deadline "make[s] the business of campaigning more difficult."  Plfs.' Br. at 12.  This is a factual claim, however,

and unsubstantiated speculation about snowbirds and road conditions cannot create a genuine issue of material fact when weighed against the actual signature-gathering experiences in and before March of four minor parties, Mr. Mitchell, Mr. Singer, and various initiative signature gatherers.  Miller Aff., ¶¶ 13, 18, 23; Mitchell Aff. ¶¶ 5-8; Singer Aff. ¶¶ 3-6; see also Rainbow Coalition of Oklahoma v. Oklahoma State Election Bd., 844 F.2d 740, 746 (10th Cir. 1988) (upholding ballot access law when minor party qualified "despite the early deadline.").

Nor have Plaintiffs shown the weather is any less conducive to signature gathering in and before March than in rainy April and May when Mr. Kelly last qualified.  Additionally, "[g]iven the unlimited petitioning window, a diligent independent or minor party candidate could meet the filing deadline by collecting signatures many months before" the deadline.  Swanson v. Worley, 490 F.3d 894, 909 (11th Cir. 2007).  There is no relationship between Montana's filing date and the number of minor party and independent candidates, and no relationship between state filing deadlines and the number of independent candidates on state ballots.  Donovan Rpt. at 31, 49.

Finally, Plaintiffs rely heavily on Mr. Winger to compare Montana's laws to those of other states.  His methods have been rejected repeatedly.  See, e.g., Swanson, 490 F.3d at 910 (Winger testified Alabama "had the second toughest

ballot access restrictions," court held "the legislative choices of other states are irrelevant"); Fishbeck v. Hechler, 85 F.3d 162, 169 (4th Cir. 1996) (Winger called West Virginia "the most inaccessible state in the country for third party and independent candidates," court rejected challenge).  "A court is no more free to impose the legislative judgments of other states on a sister state than it is free to substitute its own judgment for that of the state legislature." Libertarian Party of Florida v. Florida, 710 F.2d 790, 794 (11th Cir. 1983).  Mr. Winger also miscites the March 13 date for submitting initial petitions; the final deadline is March 20. Compare Winger Aff. at 7 with Mont. Code Ann. § 13-10-503(1) ("additional signatures may be submitted before the deadline for filing").

### 2.  Good Faith Candidates Meet the Signature Requirement.

Montana has required independent candidates to show the support of at least 5% of the vote for the successful candidate for that office in last election for more than a century, and has had the same rule for minor party candidates for four decades.  Mont. Code Ann. §§ 13-10-502, -601.  For almost as long, the Supreme Court has held that states may require "some preliminary showing of a significant modicum of support," measured by a petition requirement of at least 5% of all voters. Jenness v. Fortson, 403 U.S. 431, 442 (1971).

In 2008, the 10,243 signatures required for independent United States Senate candidates amounted to just 1.5% of the 668,085 registered voters, and 2% of

497,599 votes cast at the general election.  J.S. Undisp. Facts ¶ 43; Miller Aff. ¶ 20; Donovan Rpt. at 42, 43.  Montana's 5% rule comes in well under what the Supreme Court and others have determined to be a "significant modicum of support."  See Swanson v. Worley, 490 F.3d 894, 904 (11th Cir. 2007) (3% of votes cast for governor); Lawrence v. Blackwell, 430 F.3d 368, 375 (6th Cir. 2005) (1% of "electors"); Rainbow Coalition of Oklahoma v. Oklahoma State Election Bd., 844 F.2d 740, 747 (10th Cir. 1988) (5% of votes cast for governor or president).

Plaintiffs complain that collecting these signatures is hard work.  Plfs.' Br. at 19, citing Pearson Aff.  They ignore the fact that Mr. Kelly had an unlimited amount of time to gather these signatures.  Cf. American Party of Tex. v. White, 415 U.S. 767, 786 (1974) (55 days not "an unduly short time" for gathering 22,000 signatures "only at the rate of 400 per day"); Andress v. Reed, 880 F.2d 239, 242 (9th Cir. 1989) ("certainly the requirement that Andress collect 10,000 signatures within approximately forty-five days is reasonable and constitutionally adequate").  They also ignore Montana's other "alleviating factors that ease[] the burden of gathering signatures," such as unrestricted petition signing.  Swanson, 490 F.3d at 904.

Most significantly, Plaintiffs ignore the fact that Mr. Kelly already has borne this burden, and then some, when he gathered 11,666 valid signatures in 1994.

"'Hard work and sacrifice by dedicated volunteers are the lifeblood of any political organization' . . . and [courts] are thus unimpressed with arguments that burdens like those imposed by [the State] are too onerous," when the "plaintiffs themselves satisfied these requirements." Rainbow Coalition, 844 F.2d at 746, quoting American Party, 415 U.S. at 787 (citations omitted).  The successes of Mr. Kelly and others "demonstrate that the . . . signature requirement does not hinder diligent independent and minor party candidates." Swanson, 490 F.3d at 905.

Again, Plaintiffs also rely on Mr. Winger's comparisons, despite the fact that Montana's signature thresholds are lower than those upheld by multiple courts. Plfs.' Br. at 21-22. (Only Oregon actually uses Mr. Winger's means of measuring signatures.  Winger Aff. at 10.  The fractions of a percentage point that separate Montana's signature requirements from other states, Winger Aff. at 10-11, only shows that all lines drawn for ballot access are "necessarily arbitrary." Libertarian Party, 710 F.2d at 793 (citation omitted).  Under Mr. Winger's method, "[a]ny numerical requirement could be challenged and judicially reduced, and then again, and again until it did not exist at all." Libertarian Party, 710 F.2d at 793.  This is not what the law requires. Id.  Montana's requirements should be upheld because they do not "'freeze' the status quo by effectively barring all candidates other than those of the major parties, [Jenness, 403 U.S. at 439]," and they "provide a realistic means of ballot access. [American Party, 415 U.S. at 783]." Libertarian Party,

710 F.2d at 793.

### 3. The Filing Fee Does Not Burden Candidates Who Cannot Pay.

For 70 out of the past 76 years, Montana has required from all state candidates a filing fee equal to 1% of the annual salary for the office sought. See 1933 Mont. Laws, ch. 28, § 1; 1979 Mont. Laws, ch. 571, § 85; Mont. Code Ann. § 13-10-202(3).  Montana law also allows an indigent candidate to waive the filing fee with "a verified statement that he is unable to pay the filing fee" and the requisite number of signatures for an independent candidate to qualify for the ballot.  Mont. Code Ann. § 13-10-203(2).

Like Montana's signature requirement, these filing fees are lower than others that courts have approved.  See Green v. Mortham, 155 F.3d 1332, 1334, 1337, 1339 (11th Cir. 1998) (upholding 6 and 7.5% of annual salary filing fees, equal to $8,016 and $10,020, respectively).  The mere fact that Montana is not as wealthy as other states cannot support Plaintiffs' bare speculation that "the fee is certainly high enough to exclude many potential candidates in Montana."  Plfs.' Br. at 23-24.  In fact, there is no relationship between filing fees and ballot access across states; in Montana, the number of candidates actually increased after the return of filing fees.  Donovan Rpt. at 37, 45, figs. 2, 4.

Mr. Kelly himself paid the filing fee when he ran in 1994, see Mont. Code Ann. § 13-10-503(1) (1993), and seven Senate candidates from all walks of life

paid the filing fee in 2008, along with 30 other statewide candidates. Miller Aff., Ex. E, F; Miller Aff. ¶ 10. The only cases Plaintiffs cite in support of their filing fee challenge were decided in the early 1970s without accounting for inflation. Plfs.' Br. at 26; compare Bullock v. Carter, 405 U.S. 134, 143 (1972) with http://data.bls.gov/cgi-bin/cpicalc.pl (last visited Apr. 27, 2009) ($1,000 in 1972 has the same buying power as $5,150.79 in 2008).

Plaintiffs also acknowledge that Mr. Kelly could have waived the filing fee. Plfs.' Br. at 24-25. There is no requirement that Mr. Kelly submit an additional set of qualifying signatures one month before the filing deadline. Simply put, "the required filing fee," Mont. Code Ann. § 13-10-503(2), must be filed by the primary filing deadline, Mont. Code Ann. § 13-10-201(6), or on the same deadline the filing officer "shall accept" the indigency statement and petition "in lieu of a filing fee," Mont. Code Ann. § 13-10-203.

### 4.  The Cumulative Effect of the Ballot Access Laws is Not a Severe Burden.

When determining whether individual provisions of a state's ballot access laws unconstitutionally burden candidates' and voters' rights, "a court must examine that state's ballot access scheme in its entirety." Wood, 207 F.3d at 711. "[F]rom the point of view of one who aspires to elective public office in [Montana], alternative routes are available to getting his name printed on the ballot." Jenness, 403 U.S. at 441. Like hundreds of other candidates, Mr. Kelly

could have run as a Democratic candidate (as he did in 2002), a Green candidate

(he was their coordinator in 2008), another minor party candidate, or an

independent candidate (as he did in 1994).  Montana's ballot access scheme "in its

entirety" poses no unconstitutional burden to Mr. Kelly's ballot access.  Donovan

Rpt. at 13-19.

        a.        **Plaintiffs do not consider the law in its entirety.**

Although Plaintiffs purport to consider the "cumulative effect" of

Montana's ballot access laws, Plfs.' Br. at 26, they apply another litmus test to

only one of several paths to the ballot.  As a result, their claim that Montana's

ballot access laws are "by far the most burdensome in the nation" is suspect.

Plfs.' Br. at 26.  "There is a range of fees and signature requirements that are

constitutional, and the [Montana] legislature is free to choose its ballot access

requirements from that constitutional spectrum."  Green v. Mortham, 155 F.3d

1332, 1339 (11th Cir. Fla. 1998).

Plaintiffs' cramped view of ballot access for "independent Senate

candidates" alone, Plfs.' Br. at 26, does not even consider independent candidate

ballot access in its entirety.  Mr. Winger's analysis has excluded critical metrics.

For example, his rankings do not consider how much time states allow candidates

to petition (Montana has no time limit) or whether petition signers must exclude

themselves from voting in party primaries (Montana allows petition signers to vote

in the primary).  Donovan Rpt. at 14-18, 45.  These factors make Montana's petition laws less burdensome.  See Jenness, 403 U.S. at 442 ("somewhat higher" signature requirement balanced by voters' ability to sign unlimited petitions); Swanson, 490 F.3d at 909 (same for unlimited time to gather signatures).

### b.   Mr. Kelly has multiple paths to ballot access.

"[B]allot access alternatives should be viewed in tandem when determining their constitutionality." Green v. Mortham, 989 F. Supp. 1451, 1458 (M.D. Fla. 1998), aff'd, 155 F.3d 1332.  In viewing the entirety of the laws, "how frequently one ballot access alternative is used relative to the other simply does not matter." 989 F. Supp. at 1458.  Again, Mr. Winger has been too selective:  24 states require more signatures than Montana for minor party candidates, 12 states have no petition procedure for minor parties at all, and 6 more states have earlier filing deadlines.  R. Winger, *Ballot Access News*, Dec. 1, 2008, available at http://www.ballot-access.org/2008/120108.html#11 (visited Apr. 27, 2009); cf. Coalition for Free & Open Elections v. McElderry, 48 F.3d 493, 500 (10th Cir. 1995) (5% signature requirement less burdensome due to relative ease of minor party access); Donovan Rpt. at 33 n.64 (Montana had as many or more minor party gubernatorial candidates than 24 states).  Moreover, unlike states that require two rounds of minor party and candidate petitions, Montana does not. Libertarian Party v. Herrera, 506 F.3d 1303, 1307 (10th Cir. N.M. 2007)

(upholding dual-petition requirement).

It is telling, then, that Plaintiffs have quietly abandoned their original challenge to these minor party candidate laws.  Mr. Kelly had several options to qualify for the ballot under them.  He could have run under the banner of his own Green Party.  While he claims, without any support, that "his emphasis on progressive environmental policies and fiscal conservatism" was somehow alien to the Green Party, Kelly Interrog. Resps. 12 & 13, that is no excuse.  "Time after time established political parties . . . have, while retaining their old labels, changed their ideological direction because of the influence and leadership of those with unorthodox or 'radical' views."  Jenness, 403 U.S. at 441 n.25.  After all, Mr. Kelly ran to represent the Democratic Party in Congress.

Mr. Kelly also could run as a minor party candidate in two other ways.  He could be designated an "independent" minor party without any difference in the ballot designation.  Kimmet Aff., Ex. D; see also Socialist Workers Party v. March Fong Eu, 591 F.2d 1252, 1261 (9th Cir. 1978) ("Independent" designation on ballot does not "impermissibly burden[]" candidates).  Or, Mr. Kelly could form a party named for himself; "there is little difference between [running as the Steve Kelly Party] and running as "[Steve Kelly], independent."  Stevenson v. State Bd. of Elections, 794 F.2d 1176, 1179 (7th Cir. 1986) (Easterbrook, J., con.).  Given these options, "nothing in Anderson requires a state to accommodate each

candidate's druthers about how he should appear on the ballot." Id.

### c.   Montana has a strong history of ballot access.

The parties are agreed that like the law, the record of ballot access should be viewed cumulatively. Plfs.' Br. at 27.  Plaintiffs, however, gerrymander the "record" to include only independent candidates for United States Senate, rather than all candidates under the ballot access laws at issue.  The fact that few statewide independent candidates have qualified for the ballot means little when only a handful have ever tried to qualify for the ballot.  It means even less when many minor party candidates have qualified under the same 5% signature requirement, the same March deadline, and the same 1% filing fee.

On the question of burden the record is clear:  none of the requirements Plaintiffs challenge measurably reduced the number of candidates.  Donovan Rpt. at 35-37, 49.  "[W]hat this particular statistical evidence most poignantly suggests is that overall it was no harder to obtain [ballot] access" once the laws took effect. Green v. Mortham, 989 F. Supp. 1451, 1458 (M.D. Fla. 1998); Fishbeck v. Hechler, 85 F.3d 162, 165 (4th Cir. 1996) (rejecting "severe burden" claim when no more candidates qualified under more liberal law).  That record also includes Mr. Kelly himself, who qualified under most of the laws at issue.

Rather than discussing the full record, Plaintiffs again refer to other states' laws. Plfs.' Br. at 28.  The only controlling authority Plaintiffs cite is

distinguishable because this case involves a statewide election, not a national one.

Cf. Anderson, 460 U.S. at 803 ("The State's interest in regulating a nationwide

Presidential election is not nearly as strong . . . "); Nader v. Brewer, 531 F.3d 1028,

1038 (9th Cir. 2008) ( "candidates for president are national candidates and thus

situated differently from candidates for state offices, or even other federal offices

in Arizona").

     The remaining cases are distinguishable by the fact that their plaintiffs,

unlike Mr. Kelly, were good faith candidates who were prevented from qualifying.

See Part I, above.  These cases also address more burdensome ballot access

requirements.  In Council of Alternative Political Parties v. Hooks, 121 F.3d 876

(3d Cir. 1997), New Jersey holds odd-year elections that "exacerbate [] the

difficulties" of generating voter interest (Montana does not); minor parties needed

10% of votes cast for recognition (Montana allows either petitions or a 5%

threshold); and the state had no minor parties since at least 1913 (Montana has

had 22).  Id. at 880-81.  In New Alliance Party v. Hand, 933 F.2d 1568, 1575 (11th

Cir. 1991) (per curiam), Alabama imposed no extra burden with a simultaneous

filing deadline (similar to Montana's deadline); and only imposed a moderate

burden with the qualification of 22 candidates in 3 elections (Montana had nearly

60 candidates in 2004, 2006, and 2008).  Id. at 1575.  In Cromer v. South Carolina,

917 F.2d 819 (4th Cir. 1990), the state required signatures equal to 5% of all voters

(more than twice Montana's requirement), and offered no administrative justification for its filing deadline.  Id. at 821, 824; see also Wood, 117 F.3d at 774 (distinguishing Cromer because "the state had not even asserted administrative necessities").

Plaintiffs say they are unable to find a court that "has ever upheld a ballot-access scheme as burdensome as Montana's." Plfs.' Br. at 28.  It is truer to say that Plaintiffs are unable to find a court that has ever invalidated--or even applied strict scrutiny to--a ballot-access scheme that has allowed as many candidates to qualify as Montana's.

**B.     Montana's Ballot Access Laws Serve Compelling Interests.**

Election laws "are generally subject to a balancing standard, under which a reviewing court weighs the 'character and magnitude' of the burden imposed against the interests advanced to justify that burden," rather than strict scrutiny, "because 'common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections.'" Caruso v. Yamhill County, 422 F.3d 848, 855 (9th Cir. 2005), quoting Burdick, 504 U.S at 433.  "Where, as here, a state election law imposes restrictions on speech that are not severe, 'the State's important regulatory interests are generally sufficient' to justify it." Id. at 861, quoting Burdick, 504 U.S. at 434.

To do otherwise and "require that the regulation be narrowly tailored to

advance a compelling state interest, . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently." <u>Burdick,</u> 504 U.S. at 433. However, even if Plaintiffs could show a severe burden, Montana's interests are narrowly drawn to compelling state interests. <u>Caruso,</u> 422 F.3d at 859. Plaintiffs claim that "no court has ever found any of the interests" asserted by the State to be legitimate or compelling. Plfs.' Br. at 30. They are wrong. <u>See</u> <u>American Party</u>, 415 U.S. at 782 n.14 ("the objectives ostensibly sought by the State, *viz.*, preservation of the integrity of the electoral process and regulating the number of candidates on the ballot to avoid undue voter confusion, are compelling").

> ### 1. Montana's Ballot Access Laws Prevent Voter Confusion and Promote Voter Education.

The State has a compelling interest in "regulating the number of candidates on the ballot to avoid undue voter confusion." <u>American Party</u>, 415 U.S. at 782 n.14. As discussed in Part II(A)(2), above, requiring signatures of as many as 5% of all voters (higher than Montana's requirement) serves the state's interest "in avoiding confusion, deception, and even frustration of the democratic process at the general election." <u>Jenness</u>, 403 U.S. at 442; Donovan Rpt. at 7-11; <u>cf.</u> Kimmet Aff. Ex. D (sample ballot). These cases "establish with unmistakable clarity that States have an 'undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot. . . .'"

Munro v. Socialist Workers Party, 479 U.S. 189, 194 (1986), quoting Anderson, 460 U.S. at 788-789 n.9.

As these cases hold, signature requirements undeniably accomplish this interest by directly measuring a candidate's level of popular support, "ensuring that only bona fide independent candidates with a measure of support gain ballot access, preventing frivolous candidates from clogging the ballot and confusing voters." See Swanson, 490 F.3d at 911.  Montana's requirement of 5% of votes for the last successful candidate is particularly well suited to this purpose "because that is the most recent gauge of those voters who are politically interested and therefore most likely to sign a [candidate] petition." Rainbow Coalition, 844 F.2d at 744.

The filing deadline serves a similar purpose, in that it "limits the number of candidates that will appear on the general election ballot" and "ensures that each candidate already has the support of some of the eligible voters." Wood v. Meadows, 207 F.3d 708, 715 (4th Cir. 2000).  The filing deadline also promotes an informed electorate, by providing "a period of time prior to the general election when the full field of candidates will be known to the voters." Id.  The deadline further responds to increased early interest by voters, and was part of a broader effort to set an earlier presidential primary.  See H.B. 797 (2007), available at http://data.opi.mt.gov /bills/2007/billhtml/HB0797.htm (visited

September 9, 2008).

Plaintiffs attack these self-evident interests by arguing that the 5,000-signature minor party requirement should apply to independent candidates. Plfs.' Br. at 31. This is an incomplete reading of the statutes. The 5% rule applies to minor parties as well as independents. See Mont. Code Ann. § 13-10-601(2)(b). However, following increased minor party interest in state legislative races, in 1999 the Legislature provided a 5,000-signature ceiling to the minor party requirement to ease access for minor parties, like the Constitution Party, that qualified legislative rather than statewide candidates. Donovan Rpt. at 35, 36, 43; Miller Aff., Ex. C. Unlike the flat statewide minor party requirement, the variable independent candidate requirement already accounts for the voter interest in the "same office" the candidate is seeking. Mont. Code Ann. § 13-10-502. This sort of adaptation serves constitutional interests. Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 187 (1979) (invalidating signature requirement that was higher for local office than for state office). The minor party requirement also encourages candidates to run under a platform, thus informing voters. Donovan Rpt. at 13.

In any event, Mr. Kelly had the choice to follow the minor party path to the ballot, and declined. Even Mr. Winger concedes that Montana's 5,000-signature minor party threshold is the minimum to prevent ballots crowded with candidates

in the double digits.  Winger Aff. ¶ 22.  No statewide independent candidates who have collected more than that amount have been excluded from the ballot; when Mr. Kelly last qualified with 11,666 signatures in 1994, the two statewide independent candidates who failed to qualify both submitted well under 5,000 signatures.  Miller Aff., Ex. D.

### 2.    Montana's Ballot Access Laws Preserve Political Stability.

The State also has at least two different interests in preserving political stability.  "By placing reasonable restrictions on ballot access for independent and minor party candidates, [Montana's] election scheme discourages party-splintering and factionalism that could destabilize the political system."  Swanson, 490 F.3d at 911-12.  One function of a single candidate deadline is to prevent potential primary opponents from lying in wait under the former deadline, allowing party candidates to fight primary battles while the potential opponent skips those battles and leaps directly to the general election.  Kimmet Aff., Ex. B; Mitchell Aff. ¶ 9.

The Supreme Court has recognized the grievance of unsuccessful primary candidates who campaign and win tens of thousands of votes, only to watch another candidate march to the general election ballot "simply by filing a nominating petition signed by 5% of the total electorate."  Jenness, 403 U.S. at 440.  In response, the deadline serves several interests:

> It protects the direct primary process by refusing to recognize
> independent candidates who do not make early plans to leave a party

and take the alternative course to the ballot.  It works against
independent candidacies prompted by short-range political goals,
pique, or personal quarrel.  It is also a substantial barrier to a party
fielding an "independent" candidate to capture and bleed off votes in
the general election that might well go to another party.

Storer v. Brown, 415 U.S. 724, 735 (1974).  These interests are "compelling" and

"outweigh[] the interest the candidate and his supporters may have in making a late

rather than an early decision to seek independent ballot status."  Id. at 736; Hooks,

179 F.3d at 80 (recognizing "legitimate and important State interest" in deadline

notwithstanding "sore loser" law).

The State also has "an interest in attempting to see that the election winner

be the choice of a majority of its voters."  Williams v. Rhodes, 393 U.S. 23, 32

(1968).  The Supreme Court has "expressly approved a state's interest in limiting

the number of candidates on its ballot" to accomplish this, and has deemed the

interest "of the highest order."  Wood, 207 F.3d at 715, quoting Lubin v. Panish,

415 U.S. 709, 715 (1974).  Thus, a state may enact laws that help "assure that the

winner is the choice of a majority, or at least a strong plurality, of those voting,

without the expense and burden of runoff elections."  Bullock v. Carter, 405 U.S.

134, 145 (1972).

When candidates qualify for the ballot with less than a significant modicum

of support, even a few thousand votes can erode the successful candidate's

majority, or spoil the election of a candidate who would otherwise win a contest

of fewer candidates.  Donovan Rpt. at 2-11.  To some extent, this is the price

Montanans pay for the number of dynamic minor party and independent

candidacies their ballot access laws permit.  Yet Montanans are entitled to draw

the line somewhere, particularly where closely divided major party vote shares

(and the concomitant risk of plurality winners or spoilers) are common.

See Bullock, 405 U.S. at 145 ("we have no way of gauging the number of

candidates" in the absence of filing fees).  Mitchell Aff. ¶ 9; Miller Aff. ¶ 22;

Miller Aff., Ex. G; see also Big Spring v. Jore, 109 P.3d 219 (2005) ¶ 9

(addressing tied legislative election involving minor party candidate) (citation

omitted).

        **3.**      **Montana's Ballot Access Laws Protect the Integrity of the Election Process.**

The Supreme Court also has recognized that a state's interest in

"preservation of the integrity of the electoral process . . . [is] compelling."

American Party of Tex., 415 U.S. at 782 n.14.  Consequently, "some cutoff period

is necessary for the Secretary of State to verify the validity of signatures on the

petitions, to print the ballots, and, if necessary, to litigate any challenges."  Id.

at 787 n.18.  This process "requires pushing back the deadline for submitting

petitions by increasing the amount of time required to determine whether the

candidate has obtained the requisite number of valid petitions."  Nader v. Keith,

385 F.3d 729 at 735 (2004).  Modern election calendars therefore must

accommodate the time "necessary to administer recounts, to enable judicial resolution of election challenges on the basis of fraud, to print ballots, and to mail out and receive absentee ballots." Rainbow Coalition, 844 F.2d at 745.

On the other end of the election process, early voting shortens "[t]he effective period between the filing deadline and the election." Browne v. Bayless, 46 P.3d 416 at 419 (2002)  The federal Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA") encourages states to make absentee ballots available as early as 60 or 90 days prior to a federal general election in order to ensure sufficient transit time in military and foreign mail systems.  See 42 U.S.C. § 1973ff-2(e), (f); Keith, 385 F.3d at 737.  "Before the ballots are printed, the state must have sufficient time, after signatures are verified, to determine the order in which candidates will appear on ballots, to transmit this information to the printer, and to receive the finished ballots in time to check them for accuracy and have them reprinted if necessary." Libertarian Party v. Munro, 31 F.3d 759, 764 (9th Cir. 1994).

The federal government also has encouraged the replacement of punch card and lever voting machines, see 42 U.S.C. § 15302, and regulated electronic voting systems with detailed technology standards, see 42 U.S.C. § 15481; see, e.g., Mont. Code Ann. § 13-17-212 (testing and certification required).  New federal requirements like these "have made it necessary for States to reexamine their

election procedures." Crawford v. Marion County Election Bd., 553 U.S. 181

(2008).  Meanwhile, election administrators must address petition and registration

challenges.  See Montanans for Justice v. State, 146 P.3d 759 (2006) (petition

challenge filed August 16 decided week before the election); Montana Democratic

Party v. Eaton, 581 F.Supp.2d 1077 (2008).  The same challenges can occur during

the primary process.  Kimmet Aff. ¶ 24.

These competing demands tax the limited resources and small staffs of

Montana's 56 county clerk offices.  Kimmet Aff. and Ex. C.  The harmonized

filing deadline is easier to administer because all non-presidential candidates on the

ballot have a single deadline, so the pool of candidates closes.  Kimmet Aff.

¶¶ 9-10.  On top of these existing duties, the Legislature recently decided to bring

more Montanans into the electoral process through early no-excuse absentee voting

and late registration.  Both of these programs heavily increase election

administrator workloads in the thirty days prior to the primary and general

elections.  Kimmet Aff. ¶¶ 18-23.  Under the prior independent candidate ballot

access deadline, election administrators also would have to verify and certify

petition signatures during the critical weeks before the final day of the primary

election, June 3.  Mont. Code Ann. § 13-10-503 (2005).  The harmonized deadline

allows the State to accurately administer both the independent candidate petition

process, and the early voting and late registration processes, without compromising

either.  Kimmet Aff. ¶ 19.

## **CONCLUSION**

For the foregoing reasons, the State respectfully requests the Court to deny

Plaintiffs' Motion for Summary Judgment, and grant the State's Motion for

Summary Judgment.

Respectfully submitted this 22nd day of November, 2011.

> STEVE BULLOCK
> Montana Attorney General
> 215 North Sanders
> P.O. Box 201401
> Helena, MT 59620-1401
>
>
> By: */s/ Jennifer Anders*
> ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
> JENNIFER ANDERS
> Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2011, an accurate copy of the foregoing Secretary of State's Combined Opening and Answer Brief was served on the following persons by the following means:

  1, 2, 3      CM/ECF

      1      Clerk, U.S. District Court

      2      Mr. Laughlin McDonald
             American Civil Liberties Union Foundation, Inc.
             230 Peachtree Street, N.W.
             Suite 1440
             Atlanta, GA 30303-1513
             lmcdonald@aclu.org

      3      Ms. Jennifer Giuttari
             American Civil Liberties Union of Montana Foundation, Inc.
             241 East Alter, Suite. B
             P.O. Box 9138
             Missoula, MT 59802-9138
             jgiuttari@aclumontana.org

DATED: November 22, 2011        */s/ Jennifer Anders*
                                  Jennifer Anders
                                  Assistant Attorney General
                                  215 North Sanders
                                  P.O. Box 201401
                                  Helena, MT 59620-1401

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule Local Rule 7.1(d)(2), I certify that this brief is printed with a proportionately spaced Times New Roman text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 7,160 words, excluding certificate of service and certificate of compliance.

*/s/  Jennifer Anders*
JENNIFER ANDERS
Assistant Attorney General