LAUGHLIN MCDONALD
American Civil Liberties Union Foundation, Inc.
230 Peachtree Street NW, Suite 1440
Atlanta, GA 30303
(404) 523-2721
(404) 653-0331 (fax)
lmcdonald@aclu.org

JENNIFER A. GIUTTARI
American Civil Liberties Union
    of Montana Foundation, Inc.
241 E. Alder, Ste. B
P.O. Box 9138
Missoula, MT 59802
(406) 830-3009
jeng@aclumontana.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

|  |  |  |
|---|---|---|
| STEVE KELLY and CLARICE DREYER, | ) | |
|     Plaintiffs, | ) | |
|  | ) | |
| v. | ) | Civil No. CV-08-25-BU-SEH |
|  | ) | |
| LINDA McCULLOCH, in her official capacity as Secretary of State of the State of Montana, | ) ) ) | |
|     Defendant. | ) | |

**PLAINTIFFS' COMBINED RESPONSE AND REPLY BRIEF**

On December 10, 2010, a panel of the U.S. Court of Appeals for the Ninth Circuit reversed this Court's ruling that the plaintiffs lacked standing.  The formal mandate was issued subsequently on February 1, 2011, in accordance with Rule 41(a) of the Federal Rules of Appellate Procedure.  Pursuant to the Court's Order of November 2, 2011 (Doc. No. 114), this brief has been amended from the original filed on May 22, 2009 to delete the discussion of the plaintiffs' standing and to correct any typographical errors.

The defendant's revised Cross-Motion for Summary Judgment contends that the success of "minor party" candidates proves that Montana's ballot-access scheme isn't burdensome.  ((Def.'s Combined Opening Br. and Ans. Br. at 5-7, 9-11, 20 (hereinafter "Def.'s Br."))  This argument is completely foreclosed by controlling authority and is therefore without merit.

The defendant's brief also fails adequately to distinguish *Anderson v. Celebrezze,* 460 U.S. 780 (1983), and *Nader v. Brewer,* 531 F.3d 1028 (9th Cir. 2008), *cert. denied,* 2009 WL 578703 (Mar. 9, 2009) (mem.), the two cases that control the outcome of this

case, and it creates no dispute as to the facts that are material under those cases.

In short, the defendant's brief offers this Court no basis on which to deny the plaintiffs' motion, and no basis on which to grant summary judgment in her favor.

## I.   This case is not about "minor parties."

The defendant's brief focuses primarily on the relative success that "minor parties" have enjoyed in Montana.  Without once defining the term, the defendant refers to "minor parties" 41 times in her 31-page brief.  Noting that Kelly could have chosen the minor-party route to the ballot instead of the independent route, the gist of the defendant's argument is that the plaintiffs' claim should fail because minor parties have enjoyed robust access to the ballot.[1]

The Supreme Court considered – and rejected – this very argument in *Storer.*  The State of California argued that Gus Hall's

---

[1]See, in particular, pages 5 through 7, 9 through 11, and 18 of the defendant's brief.

challenge to that state's signature requirement for independent candidates should fail because California had provided a valid way for new political parties to qualify for ballot position.  *Storer,* 415 U.S. at 744.   The Supreme Court flatly rejected the argument: "the political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other."  *Id.* at 745. And, finding "no sufficient state interest in conditioning ballot position for an independent candidate on his forming a new political party," the Court vacated and remanded the judgment against Hall.  *Id.* at 46.

The Supreme Court reaffirmed *Storer'*s holding two years later in *McCarthy v. Briscoe,* 429 U.S. at 320, and other circuit courts have applied it in rejecting arguments identical to the one now offered by the defendant.  *See, e.g., Lee v. Keith,* 463 F. 3d 763, 772 (7th Cir. 2006); *Libertarian Party of Ohio v. Blackwell,* 462 F.3d 579, 592 (6th Cir. 2006); *McLain v. Meier,* 637 F.2d 1159, 1165 (8th Cir. 1980).  The Ninth Circuit, moreover, struck down Arizona's ballot-access scheme for independent candidates even though that state

4

has a long and robust history of ballot access for minor parties. *See Nader,* 531 F.3d at 1028; *see generally* http://www.azsos.gov/election/PreviousYears.htm (official statewide canvass results showing more than 380 minor-party candidates between 1974 and 2008). All of these cases foreclose the defendant's argument.

It is also important to recognize that Montana's ballot-access scheme knows of no such thing as a "minor party." Parties are qualified or unqualified, and the laws make no distinction between unqualified-party candidates and independents. Mont. Code Ann. § 13-10-501.

The defendant may consider some parties, such as the Libertarian and Constitution parties, to be "minor," and those parties have indeed enjoyed a small amount of success in getting on Montana's ballots. But qualified parties and their candidates do not obtain ballot access using the same process as do independent candidates. A party becomes qualified when it submits a petition containing 5,000 signatures gathered from around the state. Mont.

Code. Ann. § 13-10-601; (JS ¶ 17).  Once qualified, the party can

nominate as many candidates as it likes without submitting any

further signatures.  Mont. Code. Ann. § 13-10-601.  As a result,

even in the absence of *Storer*, it would be inappropriate to compare

the number of qualified-party candidates that have obtained ballot

access to the number of independent candidates who have obtained

ballot access.  There is simply no comparison.

## II.   The material facts remain undisputed.

In their opening brief, the plaintiffs argued that summary

judgment in their favor is appropriate because the cumulative

burdens of Montana's filing deadline, signature requirement, and

filing fee far exceed the burdens at issue in *Anderson v. Celebrezze*

and *Nader v. Brewer*, two controlling authorities that should dictate

the outcome here.  The defendant attempts to distinguish those

cases on other grounds but does not dispute the plaintiffs' claim

about the relative magnitude of the burdens in this case.

There is no dispute, for example, that the filing deadline at issue here is identical to Ohio's deadline struck down in *Anderson*.[2] Nor is there any dispute that Ohio required a much smaller number of signatures, on an absolute and relative basis, and had a much lower filing fee.

There is likewise no dispute that the filing deadline in this case is much earlier than Arizona's deadline struck down in *Nader*. Arizona also had no filing fee and required a smaller number of signatures, on a relative basis, than does Montana.

The plaintiffs also cited to cases from three other circuits that struck down lesser burdens than those at issue here.  Here again, the defendant does not dispute the plaintiffs' claim that the burdens in those cases were, in fact, lower.  She argues only that none of the ballot-access schemes in those cases "allowed as many candidates to qualify as Montana's." (Def.'s Br. 22.)  This is simply

_____

[2]Although the statutory deadlines are identical, Montana's statute actually requires petitions to be submitted one week before the statutory deadline, creating an effective deadline that is earlier than the deadline struck down in *Anderson*.

not accurate.  The Third Circuit, for example, struck down New

Jersey's ballot-access scheme despite the fact that "hundreds" of

independent and minor-party candidates had been able to qualify

for the ballot in the preceding four years.  *Council of Alternative*

*Political Parties v. Hooks,* 121 F.3d 876, 885 (3d. Cir. 1997) (Scirica,

J., dissenting).

Although she does not dispute the factual similarities, the

defendant does attempt to distinguish *Anderson* and *Nader* on the

ground that both of those cases dealt with a presidential election.

The Courts of Appeals are divided on the question whether that fact

was essential to the Supreme Court's analysis in *Anderson*, with

the majority taking the position that it was not.  *See Hooks,* 121

F.3d at 882 & n.6 (discussing cases).  At most, however, the fact

that *Anderson* and *Nader* dealt with a presidential election may

have led those courts to discount the states' asserted interests by a

small amount when balancing those interests against the burdens

at issue. Any such discounting in this case should be more than

8

offset by the heavier cumulative burdens of Montana's ballot-access scheme about which there remains no factual dispute.

Furthermore, the distinction between presidential and senatorial candidates does not necessarily cut in the defendant's favor. Holding all other factors constant, it is more reasonable to expect a nationwide candidate to have the resources necessary to collect a given number of signatures. A statewide candidate, and particularly an independent statewide candidate, will not ordinarily begin with a large volunteer network or campaign war chest.

Finally, and quite apart from the factual similarities to *Anderson* and *Nader*, there is also no dispute about the other materials facts in this case. There is no dispute, for example, that no independent candidates for the U.S. Senate have ever qualified for the ballot under the current scheme. (JS ¶ 35.) There is no dispute that the last such candidate to qualify did so in 1936, when the filing deadline was in October. (JS ¶ 34.) There is no dispute that Montana ranks in the top three states on measures of deadline, signatures, and filing fee. (JS ¶ 56.) And there is no

dispute that no other state ranks even in the top 15 on all three measures.  (*Id.*)

These undisputed facts are more than sufficient to support summary judgment in the plaintiffs' favor.


**III.  The defendant's motion for summary judgment rests on a number of flawed, erroneous, and/or irrelevant arguments.**

The defendant premises her motion for summary judgment on a number of flawed arguments, precluding summary judgment in her favor.

### A.    "Minor Party and Independent Candidates"

At the core of the defendant's motion and brief are various assertions about the success of minor party and independent candidates in achieving ballot access in Montana.  (Def.'s Br. 5 ("[S]tate ballots experienced a resurgence in minor party and independent candidates") ("Over 200 minor party and independent candidates for state offices qualified for the ballot in Montana since 1970."); *id.* at 9 ("[H]undreds of minor parties and independent

candidates have achieved ballot access"); *id.* at 10 ("[A] steady

stream of minor party and independent candidates")).  For reasons

already discussed above, any assertions about minor parties are

irrelevant, because this case is about an independent candidate for

the U.S. Senate.  The assertions are also factually inaccurate.

The record demonstrates that Montana's ballots haven't seen

hundreds of minor party *and* independent candidates.  They have

seen hundreds of minor party candidates and very few

independents.  (JS ¶¶ 31-32.)  For the kind of election at issue

here, Montana's ballots haven't seen an independent candidate

since 1936.  (JS ¶ 34.)  The very evidence on which the defendant

relies for their assertions bear this out. (Miller Aff. Ex. B.) In fact,

this evidence reveals only five independent candidates for statewide

office in the entire history of the State of Montana: J.W. Lewis, a

candidate for Superintendent of Public Instruction in 1900; C.W.

Tenny, a candidate for Superintendent of Public Instruction in

1916; Joseph Monaghan, a candidate for the U.S. Senate in 1936;

Ed Shields, a candidate for Lieutenant Governor in 1940; and Steve

11

Kelly, a candidate for the U.S. House in 1994.  (JS ¶ 31.)  This is

hardly a record of success.

**B.   "No Evidence of a Burden"**

The defendant asserts that the plaintiffs have "offered no

evidence of a burden on any candidate." (Def.'s Br. 9.)  She further

claims that the only evidence in the record "shows no significant or

substantial burden imposed by Montana law." (Def.'s Br. 10.)

Neither statement is accurate or undisputed.

The report prepared by C.B. Pearson, a longtime political

consultant with extensive petitioning experience in Montana,

catalogs and quantifies those burdens extensively. (Pls. Br. Supp,

Mot. Summ. J. Ex. 6.)  He estimates that a petition drive to collect

that many signatures before the early March deadline would take

somewhere between 854 and 1,067 person-hours of work, which is

the equivalent of one person working full time for approximately six

months. (*Id.*; JS ¶ 44) If the petition drive were to use paid or

volunteer staff, moreover, Pearson adds in an extra 10% to his

estimate for administrative tasks.  (*Id.*)  If the entire drive were to be

12

conducted by paid signature-gatherers, as many are, Pearson estimates the cost to be $25,000 to $50,000, depending on the time of year.  (*Id.*)  That's ample basis for a fact-finder to conclude that Montana's ballot-access scheme imposes a burden on candidates.

It's also inaccurate for the defendant to claim that her expert's report shows no significant burden imposed by Montana's ballot access laws.  In fact, it shows practically the opposite.  The defendant's expert admitted at his deposition that his analyses revealed a statistically significant relationship between the number of signatures required and the number of independent candidates on the ballot. (Donovan Dep. 104:23-104:10; 238:7-13; JS ¶ 55.)[3] As the number of signatures required goes up, the number of independent Senate candidates goes down.  (JS ¶ 55.)  The defendant's expert went so far as to admit that his analysis shows that Montana's ballot-access scheme for independent Senate candidates is burdensome enough that one can expect that there

_____

[3]Donovan's deposition is attached hereto as Exhibit A.

13

will be no such candidates on the ballot. (Donovan Dep. 104:10-
111:16.)

The report of the plaintiffs' rebuttal expert, Dr. Steven P. Cole,
further undermines the defendant's claim. (Cole Report.)[4] Cole
found a statistically significant relationship between signatures and
independent Senate candidates, with the number of candidates
decreasing as signatures increased.  (Cole Report 13; JS ¶ 55)  Cole
also found a statistically significant relationship between
candidates and the interaction between signatures and deadline,
with candidates, with the number of candidates decreasing as the
combination of signatures and deadline increased.  (Cole Report
14.)  And, like the defendant's expert, Cole found that Montana's
ballot access scheme is so burdensome that one would expect no
independent Senate candidates to make it onto the ballot.  (Cole
Report 16.)  In lay terms, he concludes that, according to his
empirical analyses, "Montana's ballot access requirements are

_____

[4]Cole's report is attached hereto as Exhibit B.

much greater than necessary to eliminate virtually all independent candidates from the ballot." (Cole Report 19.)

## IV.  The defendant's other arguments have no merit.

### A.  Courts have not upheld more burdensome statutes.

The defendant relies on three cases for the proposition that other courts have upheld statutes with less burdensome signature requirements: *Swanson v. Worley,* 490 F.3d 894 (11th Cir. 2007); *Lawrence v. Blackwell,* 430 F.3d 368 (6th Cir. 2005); and *Rainbow Coalition of Oklahoma v. Oklahoma State Election Bd.,* 844 F.2d 740 (10th Cir. 1988).  (Def.'s Br. 13.)  This reliance is misplaced.

None of those cases upheld a more burdensome ballot-access regime.  The Alabama statute upheld in *Swanson* required petitions to contain 3% of the votes cast in the last gubernatorial election. Although high, this signature requirement is not as high, in relative terms, as Montana's signature requirement. (Winger Report, Ex. 1; JS ¶ 53.)  More importantly, the filing deadline was in June and

there was no filing fee.  As a result, the overall burdens upheld in *Swanson* are significantly lower than the burdens at issue here.

In *Blackwell,* the Sixth Circuit upheld a ballot-access scheme that required a Congressional candidate to submit a petition containing 1% of the electors in the candidate's district.  It is impossible to determine from the case whether that number, in relative terms, would have been higher or lower than Montana's petition requirement.  Ohio's statute, however, did not apply to statewide candidates, who needed only to submit a petition containing 5,000 signatures – a number much lower than Montana's requirement in absolute and relative terms. (JS ¶ 53.) The deadline in Ohio, moreover, was one day before the primary election, while Montana's effective deadline is 82 days before the primary election.

And in *Rainbow Coalition,* the challenged statute was for minor party qualification (and a concomitant ability to gain ballot access for a virtually unlimited number of candidates), not for independent candidates.  The deadline, moreover, was May 31.

16

**B.    The time allowed for petitioning is not an issue here.**

The defendant criticizes the plaintiffs for failing to credit Montana for the unlimited amount of time that it allows candidates to collect signatures. (Def.'s Br. 13.)  She claims that this factor makes Montana's ballot access scheme less burdensome.

The question is "less burdensome than what?"  Unlimited collection periods are the rule rather than the exception.  There was no time limit in the schemes struck down in *Anderson* and *Nader,* or in most of the cases on which the plaintiffs and the defendant rely.  While the presence of a time limit could therefore add to the burdens of Montana's ballot-access scheme, the absence of one does not change the relevant comparison with other states.

**C.    It is appropriate to compare signature requirements in relative terms.**

The defendant also criticizes the plaintiffs for comparing signature requirements in relative terms. (Def.'s Br. 14.) Their own expert apparently disagrees, admitting both that relative comparisons are appropriate in this case and that the plaintiffs' method of doing so is reasonable.  (Donovan Dep. 125:13-130:21.)

Relative comparisons are also quite common in the political science literature. *See, e.g.,* Barry C. Burden, *Multiple Parties and Ballot Regulations, in Democracy in the States* (Bruce Cain et al. eds. 2008).

## V.   The defendant's justifications do not withstand scrutiny.

### A.   Preventing Voter Confusion

Montana's ballot-access scheme for independent Senate candidates goes far beyond what is necessary or reasonable to protect against voter confusion.  The Supreme Court has recognized that "laundry list" ballots, which it described as ballots with more than 12 candidates for a single office, have the potential for voter confusion.  *See Lubin v. Panish*, 415 U.S. 709, 715-18 (1974). But Montana has never had 12 candidates on the ballot for *any* statewide office. (Miller Aff., Ex B.; JS ¶ 29.)  It has never had more than a handful of candidates for the U.S. Senate.  (Miller Aff., Ex B.) These facts seriously undermine the proffered justification.

Further undermining this justification is the testimony of both parties' experts. As described above, the statistical analyses conducted by both experts demonstrate that Montana's ballot access requirements are substantially stricter than necessary to ensure that the number of independent Senate candidates remains at zero.

Yet another factor undermining this justification is Montana's party qualification and nomination regime. Minor parties need only to submit 5,000 signatures to qualify for the ballot. Qualification then allows them to run a candidate for any partisan office without the need to submit any additional signatures. (JS ¶¶ 17, 18). If Montana's much stricter ballot-access scheme for independent candidates were necessary to prevent voter confusion, one would expect to see Montana's ballots teeming with minor parties, but no such "problem" exists. A 5,000-signature requirement has proven more than adequate to keep Montana's ballots to a reasonable length.

Finally, it is apparent from C.B. Pearson's report that the ballot-access scheme does not actually advance the State's interest in limiting the ballot to serious candidates.  The scheme excludes "impecunious but serious candidates" like Steve Kelly while including unserious but wealthy candidates.[5]  *Lubin,* 415 U.S. at 717. The cumulative effect of the signature requirement, deadline, and filing fee is so burdensome that a candidate can realistically satisfy them only if he or she can afford to devote six full months to petitioning or to write $50,000 a check to a professional signature-gatherer like Pearson.  The ability to do either does not demonstrate "the genuineness of a candidacy or the extent of the voter support of an aspirant for public office." *Id.*   While such a test may shorten ballots, it does not gauge the seriousness of a candidate with sufficient accuracy to justify the burdens it imposes on the plaintiffs' First Amendment rights.

---

[5]The scheme also allows unserious candidates who are able to get the nomination of a qualified party without any showing of popular support.

20

## B.    Voter Education

The defendant's "voter education" argument sounds very familiar.  It is the same argument advanced by Ohio to justify its early deadline for independent candidates, and it is the same argument that the Supreme Court rejected in *Anderson. See Anderson,* 460 U.S. 796-98.  "In the modern world it is somewhat unrealistic to suggest that it takes more than seven months to inform the electorate about the qualifications of a particular candidate simply because he lacks a partisan label."  *Id.* at 797.  The same is true here.

In fact, the Supreme Court's reasoning in *Anderson* applies with even more force in this case.  Citing the modern communications available to voters in 1983, the Court noted that information about candidates could be "instantaneously communicated" in verbal and visual form.  *Id.* at 797.  Today, of course, we have vastly improved telecommunications networks, new technologies, and the Internet, all of which routinely provide even greater access to candidate information.  The Court also noted

that most voters in 1983 were not only literate but also "informed on a day-to-day basis about events and issues that affect election choices and about the ever-changing popularity of individual candidates." *Id.* at 797.  Today, we have almost universal literacy in the United States. The Supreme Court has shown "faith in the ability of individual voters to inform themselves about campaign issues," *id.* at 797, and so should this Court.

It is also not self-evident that Montana's stringent ballot-access requirements actually serve the State's interest in voter education.  According to the Court:

> A State's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism. As we observed in another First Amendment context, it is often true "that the best means to that end is to open the channels of communication rather than to close them." *Virginia Pharmacy Board v. Virginia Consumer Council*, 425 U.S. 748, 770, 96 S.Ct. 1817, 1829, 48 L.Ed.2d 346 (1976).

*Anderson,* 760 U.S. at 789. By reducing the number of candidates who are able to get on the ballot, Montana is limiting both electoral competition and competition in the marketplace of ideas.

22

Candidates without serious opposition on the ballot will not need to do much campaigning.  Nor will they face a vigorous debate on the issues that could inform the voters and lead to a more engaged electorate. If the State were serious about having an informed electorate, it would foster competition, not stifle it.

Finally, if Montana were truly serious about voter education, it has better means to achieve it.  The defendant could, for example, sponsor or facilitate candidate forums around the State. She could sponsor or facilitate the nonpartisan distribution of candidate platform information.  She could participate in public service announcements and other media campaigns.  These are but a few steps that the State could take to improve voter education without imposing such a heavy burden on the plaintiffs' First Amendment rights.

### C.   Political Stability

The defendant's "political stability" argument must fail for similar reasons.  The Supreme Court held in *Storer* that a state has a "compelling" interest in "the stability of its political system." 415

U.S. at 736.  But the Court held more recently that this interest does not extend so far as to permit a state to protect existing parties from competition with independent or third-party candidates.  *Anderson*, 460 U.S. at 801-02.   Indeed, "[c]ompetition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms."  *Id.* at 802 (quoting *Williams*, 393 U.S. at 32).  There is thus a critical difference between a legitimate stability interest in avoiding "splintered parties and unrestrained factionalism," *Storer*, 415 U.S. at 736, and an illegitimate "desire to protect existing political parties from competition," *Anderson*, 460 U.S. at 801.  Montana's ballot-access scheme serves the latter and not the former, and the Supreme Court has already rejected it.  *See id.* at 801-06.

The defendant suggests that the scheme encourages political stability because it "discourages party-splintering and factionalism" by preventing potential primary opponents from going straight to the general election.  (Def.'s Br. 26.)  This is nothing more than a clear-cut statement that Montana's scheme preserves political

24

stability by eliminating electoral competition.  Preventing

competition is not the same thing as preventing factionalism.

"Political competition that draws resources away from the major

parties cannot . . . be condemned as 'unrestrained factionalism.'"

*Anderson,* 460 U.S. at 802.  It is hardly surprising that partisan

legislators would want to protect their own political stability, but

that does not make it a legitimate state interest. *See Anderson,* 460

U.S. at 803 n.30 (observing that even though election laws are

written by partisan officials, "it does not follow that the particular

interests of the major parties can automatically be characterized as

legitimate state interests"); *see also Clingman v. Beaver,* 544 U.S.

581, 603 (2005) (O'Connor, J., concurring) (noting that "those in

power may be using electoral rules to erect barriers to electoral

competition").  Montana already has a disaffiliation statute for

independent candidates that is more than adequate to prevent

factionalism.  *See* Mont. Code Ann. § 13-10-507.

As the Court observed in *Anderson,* moreover, an early

deadline like Montana's is both too broad and too narrow to serve a

state's legitimate interest in political stability.  460 U.S. at 805.  It

applies to would-be candidates, like Steve Kelly, who had no

interest in running in a party's primary.  On the other hand,

Montana's deadline does nothing to prohibit actual partisans who

simply want to avoid primary competition from obtaining ballot

access as long as they decide early enough and have sufficient

resources to meet the other requirements.

It is also not clear that Montana's scheme actually does

discourage party-splintering.  The early deadline and high signature

and fee requirements force otherwise-partisan candidates to break

from the existing parties very early in the electoral process.  With

more time, those candidates might be able to reconcile or find a

new home within the existing parties.  *See Anderson,* 460 U.S. at

805.

The defendant also suggests that Montana's scheme preserves

political stability by making it more likely that the election winner

will be the choice of a majority of the voters.  (Def.'s Br. 27-28.)

This claim is difficult to square with Montana's party-qualification

regime.  Montana already has a handful of qualified parties which have the ability to nominate candidates for any partisan office.  The door is already wide open to plurality elections, and Montana's ballot-access scheme for independent candidates does nothing to close it.

### D.   Electoral Integrity

The defendant's "electoral integrity" justification amounts to an argument about administrative convenience: state officials need time to prepare the ballots.  (Def.'s Br. 28-30.)  While there must always be some sort of cut-off date, the claim that election officials need approximately seven and a half months defies credulity, the law, and the evidence.

Both the Supreme Court and the Ninth Circuit have rejected this argument.   In *Anderson,* the Supreme Court found that the administrative justification did not apply to independent candidates.  460 U.S. at 800.  Ohio did not claim that a March deadline was "necessary to allow petition signatures to be counted and verified or to permit November general election ballots to be

printed."  *Id.*  Neither does Montana.  The defendant claims only that the early deadline makes it "easier" for election officials to juggle competing demands.  (Def.'s Br. 30.)

In *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 217-18 (1986), the Supreme Court reaffirmed this holding of *Anderson*, concluding that "administrative convenience" was not a sufficient basis on which to restrain the Republican Party's freedom of association.  No court of which the plaintiffs are aware has ever held that mere administrative convenience, rather than administrative necessity, is sufficient to justify such a heavy burden on the plaintiffs' First Amendment rights.

In *Nader*, the Arizona Secretary of State claimed – as does the defendant in this case – that its early deadline was justified by "deadlines related to early voting and sample ballots and the state's schedule for printing the ballots."  531 F.3d at 1032.  The Ninth Circuit rejected this argument, finding "no satisfactory explanation in the record" as to why the state needed the time from its June filing deadline to its deadline for preparing sample ballots in mid-

September in order to prepare its general election ballot.  *Id.* at 1040.

There is likewise nothing in the record here to support a claim that the State of Montana needs even longer to prepare its ballots. The plaintiffs' counsel questioned the Secretary of State's designated representative, Lisa Kimmett, extensively about this alleged justification. (Kimmet Dep. 33:10-35:5). Her answers demonstrate that a filing deadline in June or July would leave the Secretary of State's office with ample time to verify petition signatures and prepare the ballot.  She testified, for example, that it takes relatively little time to verify signatures (which could be even further reduced with sampling techniques), and that almost all of the tasks associated with preparing the ballot are not significantly affected by the presence of independent candidates. (Kimmet Dep. 96:1-5; 97:7-98:5.)  Indeed, her answers indicate that very few of the administrative burdens upon which the defendant now relies are significantly affected by the presence of independent candidates. (*Id.)*

Three other factors further undermine the defendant's claim. First, the fact that the Secretary of State's office is apparently able to handle the preparation of multiple primary election ballots within the 75 days between the filing deadline for party candidates and the primary election strongly suggests that it does not need 236 days in order to put a handful of independent candidates on the ballot. Second, the fact that the Secretary of State's office was apparently able to print the 2008 general election ballot without undue difficulty even though the Republican presidential and vice-presidential candidates were not known until early September also casts doubt on the defendant's assertion.  And, finally, the fact that 47 other states are apparently able to prepare the ballots on a shorter timeline is a strong indication that Montana's deadline is not as necessary as the defendant now claims.

Of course, if Montana wants to ease the pressure on election officials by giving them more time, it is free to do so by other means.  The State could arguably even have an early deadline if it did not also require a large number of signatures and high filing

30

fee.  *See  Libertarian Party of Washington v. Munro*, 31 F.3d 759,

762 (9th Cir.1994) (upholding a July 4 deadline because the state

only required 200 signatures for statewide candidates).  What the

state may not do, consistent with the First Amendment, is couple

an early filing deadline with other ballot-access requirements that

result in a barrier to ballot-access that is unduly difficult to

overcome.

## VI.   Summary and Conclusion

The defendant is truly asking this Court to break new ground.

She cites not a single case that has ever upheld an effective

petition-filing deadline for non-presidential independent candidates

that both precedes the deadline for qualified-party candidates to file

for the primary election and requires a candidate to submit more

than a *de minimis* number of signatures or filing fee.  No such cases

exist.

The case law that does exist supports the plaintiffs.  *Anderson*

and *Nader*, in particular, leave no genuine issues of material fact to

be resolved at trial and therefore permit only one conclusion in this

case.  For this reason, the Court should grant the plaintiffs' motion

for summary judgment.

Respectfully submitted,

/s/ Jennifer Giutarri
JENNIFER GIUTTARI
American Civil Liberties Union
     of Montana Foundation, Inc.
P.O. Box 9138
241 E. Alder, Ste B.
Missoula, MT 59801
(406) 830-3009
jeng@aclumontana.org

/s/ Laughlin McDonald
LAUGHLIN McDONALD
American Civil Liberties Union
     Foundation, Inc.
Suite 1440
230 Peachtree Street, NW
Atlanta, GA 30303
(404) 523-2721
lmcdonald@aclu.org

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), the undersigned counsel certifies that this brief complies with the word limit of Local Rule 7.1(d)(2)(A). Exclusive of the caption and certificates of service and compliance, the brief contains 5,172 words.

/s/ Laughlin McDonald

LAUGHLIN McDONALD
American Civil Liberties Union
        Foundation, Inc.
Suite 1440
230 Peachtree Street, NW
Atlanta, GA 30303
(404) 523-2721
lmcdonald@aclu.org

33