

**FILED**

**MAY 2 5 2012**

, ATRICK E. DUFFY, CLE. ,
ʲy_____
DEPUTY CLERK, HELENA

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

### BUTTE DIVISION

|  |  |
|---|---|
| STEVE KELLY AND CLARICE DREYER, <br><br>               Plaintiffs, <br><br> vs. <br><br> LINDA McCULLOCH, in her official capacity as Secretary of State of the State of Montana, <br><br>               Defendant. | No. CV-08-25-BU-SEH <br><br> **MEMORANDUM AND ORDER** |

### INTRODUCTION

Plaintiffs, Steve Kelly (Kelly) and Clarice Dreyer (Dreyer), brought this action challenging the constitutionality of Montana's ballot access program for independent candidates seeking statewide offices.[1] The Complaint alleges Kelly is a registered Montana voter who desired "to run as an independent or minor-party candidate for United States Senate" in the 2008 general election, and that Dreyer is a registered Montana voter who wished "to vote for . . . Kelly." See Verified

---

[1] Mont. Code Ann. §§ 13-10-501, 502 and 503, and §§ 13-10-201 and 202.

Compl. at 2-3 (April 8, 2008).  Defendant, Linda McCulloch, is Montana's

Secretary of State.  Jurisdiction is claimed under  28 U.S.C. §§ 1331 and 1343.

## BACKGROUND

Montana law creates a two-tiered ballot access scheme for candidates

seeking to run for non-presidential offices: one for qualified party candidates[2] and

one for independent candidates.  Qualified parties nominate their candidates by

primary election, and their nominees appear automatically on the general election

ballot.  Persons seeking to appear as a qualified party candidate on the primary

election ballot must submit a declaration for nomination, Mont. Code Ann. § 13-

10-201, and pay the filing fee required under Mont. Code Ann. § 13-10-202.  The

declaration for nomination must be filed 75 days before the June primary election

at which the candidate seeks to appear on the ballot.  Mont. Code Ann. §§ 13-10-

503(2) and 13-10-201(6)(a).  The qualified party candidate is not required to

submit a petition with signatures from qualified voters.  See Mont. Code Ann.

§ 13-10-201.  An independent candidate, on the other hand, appears on the

general election ballot only if: the candidate files a petition for nomination in the

_____

[2] A qualified party is any party that: (1) "had a candidate for a statewide office in either of
the last two general elections [and that candidate] received a total vote that was 5% or more of
the total votes cast for the most recent successful candidate for governor;" or (2) submitted a
party-qualifying petition "signed by a number of registered voters equal to 5% or more of the
total votes cast for the successful candidate for governor at the last general election or 5,000
electors, whichever is less."  Mont. Code Ann. §§ 13-10-601(1) and (2)(b).

-2-

form "prescribed by the secretary of state," (Mont. Code Ann. § 13-10-501); the petition is supported by the signatures of qualified voters equaling "5% or more of the total vote cast for the successful candidate for the same office at the last general election," (Mont. Code Ann. § 13-10-502(2)); and the petition is accompanied by "the required filing fee." Mont. Code Ann. §§ 13-10-201(3) and 13-10-202(3). The petition must be filed no later than 75 days before the June primary election for qualified party candidates. Mont. Code Ann. §§ 13-10-503(2) and 13-10-201(6)(a). Plaintiffs claim the cumulative effect of Montana's ballot access program for independent candidates imposed an unconstitutional burden on Kelly's efforts to run for the United States Senate as an independent candidate in 2008, and upon Dreyer's desire to vote for him in that capacity.

Cross-motions for summary judgment with supporting papers have been filed together with a Joint Statement of Undisputed Facts (SUF).[3] Plaintiffs request the Court to declare Montana's ballot access program unconstitutional, and to enjoin its enforcement. Nominal damages and attorneys' fees also are sought under 28 U.S.C. §§ 1343(a)(4), 2201 and 2202. The parties agree that no genuine issues of material fact exist with respect to the claims asserted.[4] The

---

[3] Document 111.

[4] Document 106 at 3.

-3-

motions are ripe for ruling.[5]

## DISCUSSION

Restrictions on access to the ballot trigger two fundamental rights: "the

right of individuals to associate for the advancement of political beliefs, and the

right of qualified voters, regardless of their political persuasion, to cast their votes

effectively." Williams v. Rhodes, 393 U.S. 23, 30 (1968). These limitations

"strike at the heart of representative government," and warrant careful

consideration. Reynolds v. Sims, 377 U.S. 533, 555 (1964).

The right to associate for political purposes through the ballot and the right

to vote are, however, by no means absolute. Burdick v. Takushi, 504 U.S. 428,

433 (1992). "Common sense, as well as constitutional law, compels the

conclusion that government must play an active role in structuring elections." Id.

States have an interest in ensuring fair an orderly elections, and maintaining the

integrity of the ballot through reasonable restrictions. See U.S. Const. art. I, § 4,

cl. 1 (states shall prescribe "[t]he Time, Places, and Manner of holding

Elections"); Storer v. Brown, 415 U.S. 724, 730 (1974). They likewise have the

---

[5] The constitutional challenges to the voter access statutes raised in the Complaint remain
viable notwithstanding the 2008 election having been held as they fall within the capable-of-
repetition-yet-evading-review exception to the mootness rule. Farris v. Seabrook, No. 11-35620,
2012 WL 1194154, at *3 (9th Cir. April 11, 2012). "[T]he exception frequently arises in
election cases 'because the inherently brief duration of an election is almost invariably too short
to enable full litigation on the merits.' " Human Life of Wash. Inc. v. Brumsickle, 624 F.3d 990,
1002 (9th Cir. 2010)(citing Porter v. Jones, 319 F.3d 483, 490 (9th Cir. 2003)).

power to regulate how minor party and independent candidates gain access to the general election ballot. Munro v. Socialist Workers Party, 479 U.S. 189, 193 (1986). That authority, however, may not be implemented in a manner that violates the Constitution. See Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 451 (2008).

The Court must examine the ballot access law in its entirety to determine whether it is constitutional. Wood v. Meadows, 207 F.3d 708, 711 (4th Cir. 2000). It is obliged to "weigh 'the character and magnitude of the asserted injury to [the plaintiff's] rights . . . [under] the First and Fourteenth Amendments' against 'the precise interests put forward by the State as justifications for the burden imposed by its [ballot access law]." Nader v. Brewer, 531 F.3d 1028, 1034 (9th Cir. 2008)(citing Anderson v. Celebrezze, 460 U.S. 780, 789 (1983)). "[T]he level of scrutiny [to be] applied" depends upon "the severity of the burden the election law imposes on the plaintiff's rights." Nader, 531 F.3d at 1034. Election laws that impose a severe burden on a plaintiff's constitutional rights are "subject to strict scrutiny and can be upheld only if [they are] narrowly tailored to serve a compelling state interest." Nader, 531 F.3d at 1035 (citing Burdick, 504 U.S. at 434). Election laws that impose only "reasonable, nondiscriminatory restrictions," are subject to less scrutiny and will be upheld if justified by "the state's important

regulatory interests." Anderson, 460 U.S. at 788.

The Court must first consider the "character and magnitude" of the asserted

burden on Plaintiff's rights under the First and Fourteenth Amendments.

Anderson, 460 U.S. at 789.[6] "[I]t then must identify and evaluate the precise

interests put forward by the State as justifications for the burden imposed by its

[ballot access program] . . . the legitimacy and strength of each of those interests . .

. [and] . . . the extent to which those interests make it necessary to burden the

plaintiff[s]' rights." Anderson, 460 U.S. at 789.

The issues in this case are squarely framed by weighing and assessing the

burdens imposed upon independent candidates by Montana's ballot access

program against the backdrop of the State's stated justifications for the program.

Both the burdens and the justifications will be examined in detail.

---

[6] A ballot access program is deemed to impose a severe burden on a candidate's
constitutional rights if the combined effect of its restrictions would, in most instances, prevent a
"'reasonably diligent'" candidate from obtaining a place on the ballot. Nader, 531 F.3d at 1035
(citing Libertarian Party of Wash. v. Munro, 31 F.3d 759, 761-62 (1994)). Two primary types of
evidence are examined in determining the severity of the burden imposed by a ballot access
program:

    1.    How the program at issue compares with ballot access programs in each of
            the other 49 states; and

    2.    Whether the track record of the program at issue, upon examination, is
            determined to have had a stifling impact on independent candidates since
            its inception.

See Lee v. Keith, 463 F.3d 763, 768 (7th Cir. 2006).

## **Signature Requirement**

Montana requires an independent Senate candidate to collect signatures

equaling 5% of the total vote cast for the successful candidate for the same office

at the last general election. Mont. Code Ann. § 13-10-502(2). Plaintiffs assert this

threshold is too high for an independent candidate to achieve.

Montana's 5% signature requirement is in fact greater than the signature

requirement in most states. By way of specific example, an independent

candidate for the United States Senate in 2008 was required to present a

nomination petition with "at least 10,243 valid signatures," a number that

represented "1.5[%] of the 668,085 registered voters in Montana and 2[%] of the

497,599 total votes cast in the [2008] general election." SUF at ¶ ¶ 42-43.

Montana's signature "requirement for independent Senate candidate[s] . . .

constituted the highest ratio of petition signatures to votes cast for President in the

2004 general election for any state in the nation: 2.27[%]." SUF at ¶ 53. "The

same ratio was less than 1[%] for 37 states." Id. The median ratio for all states

was .43%. Id. The mean for all states was .63%. Id.[7]

---

[7] A statistical relationship has been shown to exist "between the required number of
signatures under a state's ballot access [program] and the number of independent candidates
appearing on the ballot in the United States Senate contests from 2004 to 2008. As the signature
requirement increases, the number of independent candidates decreases." SUF at ¶ 55.

However, as a general proposition, the 5% signature requirement has
received the stamp of constitutional approval in numerous ballot access challenges
dating back four decades. See, e.g., Am. Party of Tex. v. White, 415 U.S. 767,
789 (1974)("Demanding signatures equal in number to 3% or 5% of the vote in
the last election is not invalid on its face."); Storer, 415 U.S. at 738 (5%
requirement not facially excessive); Jenness v. Fortson, 403 U.S. 431, 438-39
(1971)(upholding Georgia statute requiring signatures of 5% of registered voters
before independent candidate could be placed on ballot); Cartwright v. Barnes,
304 F.3d 1138, 1141-42 (11th Cir. 2002)(reaffirming constitutionality of
Georgia's 5% signature requirement); Rainbow Coalition of Okla. v. Okla. State
Election Bd., 844 F.2d 740, 741-44 (10th Cir. 1988)(upholding Oklahoma statute
requiring signatures of 5% of the number of votes cast in most recent election).
The above-cited cases and the rationales expressed in them are persuasive.
Montana's 5% signature requirement does not intrude in a significant manner
upon the rights of independent candidates.

The 5% signature requirement has been in effect in Montana since 1895.
See Mont. Const., Codes & Statutes 1895, pt. 3, tit. 2, ch. 8, § 1313, at 106; Mont.
Code Ann. § 13-10-502(2); SUF at ¶ 7. And, since Montana became a state in
1889, "five independent candidates [have qualified to run] for statewide office . . .:

-8-

J.W. Lewis, a candidate for Superintendent of Public Instruction in 1900; C.W.

Tenny, a candidate for Superintendent of Public Instruction in 1916; Joseph

Monaghan, a candidate for the United States Senate in 1936; Ed Shields, a

candidate for Lieutenant Governor in 1940; and Steve Kelly, a candidate for the

United States House of Representatives in 1994." SUF at ¶ 31. Each of these

independent candidates was able to successfully complete the 5% signature

requirement for placement on the ballot. Moreover, Kelly met the requirement in

1994 by collecting 11,666 valid signatures in April and May of 1994. SUF at

¶¶ 37, 39. Most of the signatures were collected by Kelly himself. SUF at ¶ 37.

Montana, like every other state, has a right to require independent

candidates to make "a showing of a significant modicum of support" in order to

qualify for placement on the ballot. Munro, 479 U.S. at 193-94; see also

Anderson, 460 U.S. at 788-89 n. 9. The 5% signature requirement undeniably

accomplishes this interest by directly measuring a candidate's level of popular

support. It "ensur[es] that only bona fide independent candidates with a measure

of support gain ballot access." Swanson v. Worley, 490 F.3d 894, 911 (11th Cir.

2007). It also "prevent[s] frivolous candidates from clogging the ballot and

confusing voters." Id. The burden imposed by the 5% signature requirement is not

severe. Montana's important state interest of requiring each candidate on the

-9-

ballot have a modicum of support is sufficient to justify the burden. It is not
unconstitutional.

## Filing Fee Requirement

Montana requires all state candidates to pay a filing fee equal to 1% of the
annual salary of the office sought. Mont. Code Ann. § 13-10-202(3). The fee
applies to all candidates (qualified party candidates and independent candidates).
Id. In 2008, the 1% filing fee for United States Senate candidates was $1,693.
SUF at ¶ 42. Plaintiffs claim the fee is excessive.

The $1,693 filing fee was higher than the filing fee in most states in 2008.
It is tied with the fee of 5 other states for the third highest in the nation. SUF at
¶ 50. Only Georgia and Florida had higher filing fees. Id. "Thirty-one states had
no filing fee . . . for independent Senate candidates." Id. "Of the nineteen states
that [had] filing fees, nine had fees of $500 or less." Id. Montana's filing fee is
lower, however, than other filing fees approved by courts. See, e.g., Green v.
Mortham, 155 F.3d 1332, 1334-39 (11th Cir. 1998)(upholding 6% and 7.5% filing
fees).

The 1% filing fee has been in effect in Montana since 1933, except for years
1973 through 1979, when no filing fee was required. See 1933 Mont. Laws, ch.
28 § 1; 1973 Mont. Laws, ch. 237, § 1; 1979 Mont. Laws, ch. 571, § 85; Mont.

Code Ann. § 13-10-202(3); SUF at ¶ 8.  No showing has been made that the 1%

filing fee has operated to exclude a potential independent candidate.  "All 36

[Montana] statewide candidates in 2008 paid the [1%] filing fee, including all 7

Senate candidates."  SUF at ¶ 51.  It is undisputed that "Kelly, who has an income

of . . . less than $30,000 annually, paid the 1% filing fee in 1994 and could have

afforded to pay [the fee] again in 2008."  Id.  Moreover, any independent

candidate who is unable to pay the filing fee, could have avoided it by submitting

a verified statement of indigency, and a petition containing the required number of

signatures for an independent candidate to qualify for the ballot.  Mont. Code Ann.

§ 13-10-203(2); SUF at ¶ 51.

　　　In sum, the burden imposed by the 1% filing fee is not severe.  Montana's

important state interest in regulating the number of candidates on the ballot

justifies the burden imposed by the fee.  It is not unconstitutional.

## **Deadline for Filing Nomination Petition**

　　　The most serious constitutional challenge in this case is to the deadline for

filing the nomination petition, which requires an independent candidate to file a

nomination petition in March, 75 days before the June primary election.  Mont.

Code Ann. §§ 13-10-503 and 13-10-201(6)(a).  This deadline was established as

part of the 2007 amendment to Montana's ballot access program.  See 2007 Mont.

Laws, ch. 458; SUF at ¶ 12. Prior to the 2007 amendment, the petition deadline

was in June, one week before the primary election. See 1991 Mont. Laws, ch.

591; SUF at ¶ 11. Senate Bill 270, which resulted in the 2007 amendment, was

proposed at the request of the Montana County Clerks and Recorders who sought

to have the June petition deadline moved back to March to coincide with the filing

date for persons seeking the nomination of a qualified party. See Affidavit of Lisa

Kimmet (Document 120) at 2; Notes of Senate State Administration Committee on

S.B. 270 (Feb. 2, 2007), Ex. B to Kimmet Affidavit.

In 2008, the nomination petition deadline was March 13, 2008. SUF at

¶ 46. Plaintiffs claim the deadline creates an undue burden because: (1) it

deprives independent candidates of the opportunity to learn the identity of the

qualified party candidates before making a determination on whether to run for an

elected office;[8] (2) it compels independent candidates "to do their signature

gathering and early campaigning in late fall and winter, when the weather in

Montana is often inclement;"[9] (3) it precludes independent candidates from

gathering signatures at the polling places for school elections as those elections

---

[8] Document 116 at 11-12.

[9] Document 116 at 12.

are held in early May;"[10] and (4) it puts independent candidates "at a competitive

disadvantage in the electoral process" because it requires them to begin

campaigning prior to the March petition deadline when voters are less interested,

while the qualified party candidates "do virtually all of their campaigning in the

Spring and Summer" prior to the primary and general elections, when voter

interest is higher.[11]

Many courts, including the United States Supreme Court, have consistently

held that a filing deadline 75 days in advance of the primary imposes a significant

burden on independent candidates.  See Anderson, 460 U.S. at 790-95 (March 20

filing deadline for independent candidates (75 days before June primary)

sufficiently weighty to warrant strict scrutiny); Cromer v. South Carolina, 917

F.2d 819, 823-24 (4th Cir. 1990)(March 30 filing deadline for independent

candidates (70 days before June primary election) imposed significant burden);

Cripps v. Seneca County Bd. of Elections, 629 F. Supp. 1335, 1343-44 (N.D. Ohio

1985)(February filing deadline for independent candidates (75 days before May

primary) imposed significant burden); Stoddard v. Quinn, 593 F. Supp. 300, 304-

05 (D. Me. 1984)(April 1 filing deadline for independent candidates (60 days

---

[10] Document 116 at 13; SUF at ¶ 13.

[11] Document 116 at 13-14.

-13-

before June primary) imposed severe burden); see also Nader, 531 F.3d at 1039 (filing deadline for independent candidates 90 days before primary imposed severe burden requiring strict scrutiny). A comparable significant-burden analysis of the Montana statute is required here.

One primary burden imposed by Montana's March filing deadline is that the opportunity of an independent candidate to qualify to run is effectively cut off 2 ½ months before the June primary election, and 7 ½ months before the November general election, and during a time frame when the qualified party candidates have not been chosen, their identities may not even be known, and the populace is not politically energized. See Anderson 460 U.S. at 790-92; Cromer, 917 F.2d at 823-24. Only after qualified party candidates are identified, do issues begin to coalesce such that independent candidates with opposing or different views may emerge. Cromer, 917 F.2d at 823. The March filing deadline may also burden signature gathering efforts of independent candidates because signatures must be gathered months before the primary election and at a time when volunteers may be difficult to recruit and voters are less interested in the campaign. See Anderson, 460 U.S. at 792; Wood, 207 F.3d at 711.[12]

Montana's 2008 filing deadline "(March 13, 2008) was the third earliest

---

[12] Kelly's successful signature gathering efforts in 1994 can be said to warrant the observation that this argument is less persuasive than others.

-14-

[deadline] in the nation" when compared to other states. SUF at ¶ 46. "Only Mississippi (January 11, 2008) and Ohio (March 3, 2008) had earlier deadlines." Id. However, "both of those states held their . . . primaries in March, as opposed to June." Id. "[Twenty-seven] states had petition filing deadlines later than June 30, 2008." SUF at ¶ 48. "Eleven states had [a filing] deadline[] in July 2008." SUF at ¶ 49. "Thirteen states had [a filing] deadline[] in August 2008." Id. "Three states had [a filing] deadline[] in September 2008." Id. "Only seven states – Idaho, Ohio, Mississippi, Montana, Nevada, Tennessee and Utah – had [a filing] deadline[] prior to May 1, 2008." Id. Montana's filing deadline and signature requirement for independent United States Senate candidates in 2008, when compared with the same requirements of the other 49 states, "ranks in the top 3" on both measures. SUF at ¶ 56.

Election history also supports a conclusion that the March filing deadline presents a significant burden. During an 18 year period from 1973 to 1991, Montana's petition filing deadline was in March. 1973 Mont. Laws, ch. 237; 1991 Mont. Laws, ch. 591; SUF at ¶¶ 10-11. No "independent candidate for [a] nonpresidential statewide office [was] on [Montana's] general election ballot" during that time period. SUF at ¶ 35. The 4 candidates "who qualified for the ballot between 1900 and 1940," (Lewis, Tenny, Monaghan and Shield), each had a

-15-

filing deadline in October, "30 days before the general election." SUF at ¶ 33.

When "Kelly qualified for the ballot in 1994 as an independent . . . candidate" for

the United States House of Representatives, the filing deadline was in June, one

week before the primary election. Id.

As noted, prior to 2007, the petition deadline for an independent candidate

for many years had been one week before the primary election. SUF at ¶¶ 11-12.

The conclusion is inescapable that the 2007 change establishing the March

deadline had the effect of placing a significant burden on the rights of independent

candidates to associate for the advancement of political beliefs, and on the rights

of Montana voters who wish to vote for independent candidates. See Anderson,

460 U.S. at 786.

The second step in the Anderson analysis is to identify and evaluate the

precise interests put forward by the State as justifications for the burden imposed

by [the March filing deadline] . . . [and] determine the legitimacy and strength of

each of those interests." Anderson, 460 U.S. at 789. Defendant claims that even

under strict scrutiny, the March filing deadline is justified and constitutional

because: (1) it prevents voter confusion by "limit[ing] the number of candidates

that will appear on the general election ballot;"[13] (2) it "promotes an informed

---

[13] Document 118 at 24 (citing Wood, 207 F.3d at 715).

-16-

electorate, by providing 'a period of time prior to the general election when the full field of candidates will be known to the voters;'"[14] (3) it promotes equal treatment of candidates by providing a single filing deadline for independent candidates and qualified party candidates;[15] (4) it promotes political stability "'by refusing to recognize independent candidates who do not make early plans to leave a party and take the alternative [independent] course to the ballot;'"[16] (5) it minimizes vote-splitting where an "'independent' candidate . . . capture[s] and bleed[s] off votes in the general election that might" otherwise go to a more popular qualified party candidate;[17] and (6) it provides "'the Secretary of State [sufficient time] to verify the validity of signatures on the petitions, to print the ballots, and, if necessary, to litigate any challenges'" prior to the November general election.[18]

Although the stated justifications of preventing voter confusion, encouraging an informed electorate, equal treatment of candidates, political stability, and administrative concerns have been generally recognized by courts as

---

[14] Document 118 at 24 (citing Wood, 207 F.3d at 715).

[15] Document 118 at 26; Document 126 at 9.

[16] Document 118 at 26-27 (citing Storer, 415 U.S. at 735).

[17] Document 118 at 27 (citing Storer, 415 U.S. at 735).

[18] Document 118 at 28 (citing Am. Party of Tex., 415 U.S. at 787 n. 18).

-17-

legitimate state interests,[19] this Court has not been able to find a single reported

case in which a filing deadline for independent candidates 75 days before the

primary election, and 7 months before the general election, has been found to be

necessary to advance any legitimate state interest. To the contrary, courts have

consistently held that such an early filing deadline for independent candidates is

not justified, and is unconstitutional. See Anderson, 460 U.S. at 796-806; Cromer,

917 F.2d at 824-26; Cripps, 629 F. Supp. at 1342-44; Stoddard, 593 F. Supp. at

309.[20]

Voter education does not justify a March filing deadline. It is at bottom

"unrealistic to suggest that it takes more than seven months to inform the

electorate about the qualifications of [an independent] candidate simply because

he lacks a partisan label." Anderson, 460 U.S. at 797.

Equal treatment, likewise, cannot be argued to justify a March filing

deadline for independent candidates. An early filing deadline for qualified party

candidates is justified by administrative concerns because 75 days "appears to be a

reasonable time for processing . . . documents submitted by [the qualified party]

---

[19] See, e.g., Anderson, 460 U.S. at 796-802; Wood; 207 F.3d at 715.

[20] See also New Alliance Party of Ala. v. Hand, 933 F.2d 1568, 1576 (11th Cir.
1991)(April 6 petition filing deadline for minor party candidates approximately 7 months before
general election unconstitutional).

candidates and preparing the [primary election] ballot." <u>Anderson</u> 460 U.S. at 800. Independent candidates, however, do not participate in the primary election. <u>Id.</u> at 801. The reasons justifying a March filing deadline for qualified party candidates plainly do not apply to independent candidates.

Defendant's political stability justification arguments amount to efforts to protect qualified party nominees from competition for voter support, and to assist them in garnering campaign resources which otherwise might go to independent candidates previously affiliated with a qualified party. Such undertakings to protect the established order of things and the interests of traditional political parties is of itself questionable.

The United States Supreme Court has "squarely held that protecting the Republican and Democratic parties from external competition cannot justify the virtual exclusion of other political aspirants from the political arena." <u>Anderson</u> 460 U.S. at 802 (citing <u>Williams v. Rhodes</u>, 393 U.S. 23, 31-32 (1968)). "'Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms.'" <u>Id.</u> First Amendment values outweigh the State's interest in protecting the two major political parties. <u>Id.</u>

Administrative concerns also do not justify the March filing deadline. Perhaps it can be argued that election officials need some reasonable period of

-19-

time to validate petition signatures and prepare ballots. However, the claim that 7 ½ months is required to complete these administrative tasks is a bow to bureaucratic inefficiency. It defies credibility.

Although no constitutional maximum or minimum time period has been established for administrative matters, most states appear to have found 90 to 120 days for such purposes to be reasonable. In 2008, "27 states had [a] petition filing deadline[] later than June 30, 2008." SUF at ¶ 48. "Eleven states had [a filing] deadline[] in July 2008." SUF at ¶ 49. "Thirteen states had [a filing] deadline[] in August 2008." Id. "Three states had [a filing] deadline[] in September." Id.

Montana successfully employed a June filing deadline in the past. As noted above, during the 16-year period from 1991 to 2007, Montana's filing deadline was one week before the June primary election.[21] A June filing deadline for independent and minor party candidates has been declared constitutional by a number of courts. See Wood, 207 F.3d at 715-17 (June filing deadline for independent candidates found to be constitutional); Jenness, 403 U.S. at 433-34 (June filing deadline for minor party candidates held constitutional); Rainbow Coalition of Okla., 844 F.2d at 747 (May 31 filing deadline for minor party candidates held constitutional). In contrast, Montana's present early filing

_____

[21] See 1991 Mont. Laws, ch. 591; 2007 Mont. Laws, ch. 458; SUF at ¶¶ 11-12.

deadline in March presents a significant barrier to ballot access. On this record it cannot be said to be justified by any compelling state interest.

## CONCLUSION

This Court has no desire or objective to usurp the authority of the Montana legislature in providing for and appropriately regulating the election process to ensure its implementation and protection as a part of our system of self-government. That authority must give way, if necessary, to protect constitutionally guaranteed rights of individuals to seek office and to vote. In this case, the undisputed facts and the established law oblige the Court to conclude that enforcement of Montana's March filing deadline statutes for independent candidates, Mont. Code Ann. §§ 13-10-503(2) and 13-10-201(6)(a), violates Plaintiff Kelly's First Amendment right to associate as an independent candidate, and Dreyer's right to vote for Kelly.

## ORDER

1.      Plaintiffs' Motion for Summary Judgment[22] is GRANTED in part as follows:

   a.      The filing deadline for independent candidates established by Mont. Code Ann. §§ 13-10-503(2) and 13-10-201(6)(a), imposes a

_____

[22] Document 115.

-21-

significant barrier to the exercise of rights protected and guaranteed

by the First and Fourteenth Amendments to the Constitution of the

United States and is unconstitutional.

b.      Defendant is enjoined from enforcing Montana's filing

deadline for independent candidates.

2.      Defendant's Cross-Motion for Summary Judgment[23] is DENIED.

DATED this **25**th day of May, 2012.

SAM E. HADDON
United States District Judge

_____

[23] Document 117.

-22-